115 F.3d 501
 155 L.R.R.M. (BNA) 2452, 134 Lab.Cas. P 10,002,
12 IER Cases 1627
 Thomas SCHMIDT, Cynthia Schmidt, and Jeri Lynn Richie,
individually and in her capacity as an
officer/agent of Riley Enterprises,
Inc., d/b/a Reflections Salon
of Beauty,
Plaintiffs-
Appellants,
v.
AMERITECH CORPORATION, Herbert Mazanke, and William Gerlich,
Defendants-Appellees.
 No. 96-2067.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 7, 1996.
Decided June 6, 1997.
 
 James T. Harrison (argued), Harrison Law Offices, Woodstock, IL, for Plaintiffs-Appellants.
 Benjamin Ghess (argued), Susan Irion, Adam Kingsley, Ameritech Corporation, Chicago, IL, for Defendants-Appellees.
 Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.
 DIANE P. WOOD, Circuit Judge.
 
 
 1
 We have moved some distance from the days when an employee "sold his soul to the company store" when he was hired. Plaintiffs Thomas and Cynthia Schmidt may have thought otherwise, however, when defendant Ameritech Corporation decided to use its unique access to its Message Unit Detail, or MUD, records to investigate what Thomas was doing while he was on a leave of absence from his Ameritech job. Thomas and Cynthia began this suit for invasion of privacy in Cook County Circuit Court, but Ameritech removed it to federal court, claiming that Thomas's claims were preempted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. After some additional procedural moves, the district court denied the Schmidts' motion to remand the case to state court and dismissed their action outright. We conclude that section 301 does not apply to this case, and as there was no independent basis for federal jurisdiction, the case must be remanded to state court for further proceedings.
 
 
 2
 * Thomas Schmidt had a job with Ameritech as a Customer Service Technician; his wife, Cynthia Schmidt, was not an Ameritech employee, nor was Jeri Lynn Richie, who eventually became the third plaintiff in this case. Richie was the owner and operator of the "Reflections Salon of Beauty," where Cynthia Schmidt worked. Like most people with residential telephone service in the greater Chicago area, the Schmidts were customers of Ameritech. Included in the materials they received from Ameritech was the statement that "[c]ustomer information maintained by Ameritech is protected by law and can be released only through a court order."
 
 
 3
 On June 26, 1994, Thomas injured his knee and as a result took a disability leave of absence until August 4, 1994. On July 15, 1994, he had an MRI performed on the knee, and then he and Cynthia left for Canada on their honeymoon. During their time in Canada, Thomas periodically checked his residence for messages. In this way he learned on July 22 that his MRI results were available, but when he called his doctor he was told that the test results would not be released by telephone. He also learned that Herbert Mazanke, his supervisor at Ameritech, had left a message saying that he wanted the MRI results. Thomas therefore called Mazanke and left a message telling him that Thomas would give him the MRI results the following Monday, July 25. Back in Chicago, Thomas met with his doctor that Monday and was released to return to work on August 4, with a light duty restriction until August 18 when he could return to full duty. He reported this information to Mazanke the same day.
 
 
 4
 On August 4, Schmidt returned to work. Mazanke immediately called him into a meeting, where he was questioned about his disability and his whereabouts on July 21, 1994. Also present at this meeting was another member of Ameritech's management, Doug Kotlinski. Thomas was told that he was being suspended pending Ameritech's investigation into the circumstances of his disability leave. At another meeting on August 24, at which Mazanke and other Ameritech representatives were again present, Schmidt was told that Ameritech knew where he and his wife had gone and whom they had telephoned while they were away. He was told that they had obtained this knowledge by reviewing Ameritech's MUD records. The next day, Ameritech fired him.
 
 
 5
 It turned out that during the time the Schmidts were away, Ameritech monitored calls made to and from their residential telephone, as well as calls the Schmidts made using their residential telephone calling card, and it kept a log of those calls. Based on the information it gained through this monitoring, Ameritech contacted the kennel where the Schmidts had boarded their dog, and it contacted the resort in Canada where they were staying. During the same time period, Ameritech also accessed and used the personal telephone records of Jeri Lynn Richie, Cynthia's employer.
 
 
 6
 After he was fired, Thomas filed a grievance with the company. The grievance went to an arbitrator, who ordered him reinstated, but refused a year's back pay because he found that Schmidt had attempted to mislead Ameritech while he was on his Canadian trip. The Schmidts then filed a two-count complaint against Ameritech, Herbert Mazanke, and William Gerlich (collectively "Ameritech" for our purposes) in Cook County Circuit Court, alleging that Ameritech violated their state law right to privacy in two respects when it accessed the MUD records. Specifically, they claimed that Ameritech had "intruded upon their seclusion," as that term may be recognized in Illinois law, Lovgren v. Citizens First National Bank of Princeton, 126 Ill.2d 411, 128 Ill.Dec. 542, 543, 534 N.E.2d 987, 988 (1989) (defining the tort of intrusion upon another's seclusion but reserving decision on whether the tort exists in Illinois); Thomas v. Pearl, 998 F.2d 447, 452 (7th Cir.1993) (analyzing the tort as if it were recognized by Illinois); Brazinski v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1183 (7th Cir.1993) (noting that Illinois has not yet decided whether to recognize this tort), and that it had made private facts public, a second variety of a privacy claim Illinois law recognizes. Roe v. Cradduck, 198 Ill.App.3d 454, 144 Ill.Dec. 636, 638, 555 N.E.2d 1155, 1157 (5th Dist.1990); Midwest Glass Company v. Stanford Development Co., 34 Ill.App.3d 130, 133, 339 N.E.2d 274, 277 (1st Dist.1975). Ameritech removed on the theory that the claim required interpretation of the collective bargaining agreement (CBA) between it and its employees and was therefore completely preempted by § 301. After the case reached federal court, the Schmidts amended their complaint to add Jeri Lynn Richie as a third plaintiff. On the same day, they filed a motion to remand the case to state court, arguing that the privacy claims did not implicate the CBA and that no other basis for federal jurisdiction was present (as there was no diversity of citizenship).
 
 
 7
 The district court agreed with Ameritech that the invasion of privacy claim was really a subject for the CBA, focusing on the company's right to investigate its workers to make sure they were complying with applicable regulations and the fact that these kinds of claims are normally grievable. Indeed, that is precisely what Thomas did, at least with respect to his firing. To the extent that Thomas did not raise other claims before the arbitrator, the district court found that he had failed to exhaust his remedies as required for a § 301 suit. The court rejected Cynthia's claims and Richie's claims, which it considered as within its supplemental jurisdiction, on the merits.
 
 II
 
 8
 In keeping with the goal of maintaining a uniform national labor policy, the Supreme Court has given a broad preemptive sweep to § 301 of the LMRA. Acknowledging that lines must be drawn between bona fide state law claims that should not be preempted and those that fall within the statute, the Court explained how to approach the question in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988):
 
 
 9
 If the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is preempted and federal labor-law principles-necessarily uniform throughout the Nation--must be employed to resolve the dispute.
 
 
 10
 Id. at 405-06, 108 S.Ct. at 1881 (citing Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962)). See also Livadas v. Bradshaw, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994) (§ 1983 claim against state Labor Commissioner alleging deprivation of NLRA rights for failure to enforce California Labor Code not preempted by § 301); Kohl's Food Stores, Inc. v. Hyland, 32 F.3d 1075, 1078 (7th Cir.1994) (claim under state's worker's compensation statute not preempted by § 301). We must therefore decide whether Thomas Schmidt's state law claims (which are the only ones that might even arguably fall within § 301) require interpretation of the CBA between Ameritech and its employees.
 
 
 11
 To answer that question, we must look more carefully at exactly what Schmidt is and is not challenging in his lawsuit. He is not saying that Ameritech had no right to investigate possible misconduct by its employees, nor is he challenging the result of this particular investigation (either his termination or the subsequent result of the arbitration proceeding). He is arguing instead that he, in his capacity as an Ameritech customer, had the same right to protection for his customer information as all other Ameritech customers: namely, that Ameritech would keep this information confidential and release it only through a court order. Naturally, the claims of Cynthia Schmidt and Jeri Lynn Richie are even more clearly based on this theory, since they had no employment relationship with Ameritech to begin with.
 
 
 12
 Ameritech's response is eerily reminiscent of Orwell's Big Brother. Most Ameritech customers enjoy confidentiality in their telephone records, and Ameritech goes to great lengths to keep those records secure except in response to a court order, but Ameritech employees, it says, are in a unique position. Ameritech's lawyer stressed at oral argument that the MUD records "belong" to Ameritech, and from that he reasoned that Ameritech had every right to consult those files in the course of its internal management of the company. This means, in essence, that every Ameritech employee, from the CEO on down to the lowliest worker, can expect to have Ameritech reading the records of telephone calls placed from his or her line (which is what MUD records are) at any time, for any reason. Furthermore, the logic of Ameritech's ownership argument suggests that Ameritech could listen in to anyone's telephone calls whenever it wants, calling employees on the carpet for spending too much (or too little!) time in the evening on the telephone, criticizing them for patronizing the wrong "900" numbers, and reviewing their calling records every time they take a sick day off. Indeed, the logic of the "ownership" theory suggests that Ameritech could use even non-employees' MUD records or telephone lines any way it wants. The lines belong to Ameritech, after all, and the records of calls belong to it also. The only way to avoid such extreme intrusion would be for an employee to forego residential telephone service altogether, at least until local line competition develops into a more serious alternative than it was in 1994 or than it remains today. In today's society, that is hardly a practical alternative, as Ameritech well knows. It is far from clear, moreover, that such a broad approach would pass muster under the federal Communications Act. See 47 U.S.C. § 605 (1997) (prohibiting the unauthorized publication or use of wire communications).
 
 
 13
 But before we become too concerned about the breadth of Ameritech's argument, we return to the essence of the plaintiffs' case. This is not the first time we have seen complaints about employer surveillance of various types. In Matter of Amoco Petroleum Additives Co., 964 F.2d 706 (7th Cir.1992), employees brought invasion of privacy and intentional infliction of emotional distress claims against an employer who had secretly mounted a camera at the entrance to the women's locker room for investigative purposes. This court held that the employees' claims were preempted by § 301. "Privacy in the workplace," we noted, "is an ordinary subject of bargaining." Id. at 710. Although workers have some expectation of privacy in the workplace, the objective reasonableness of those expectations "depends on powers and duties specified in the collective bargaining agreement." Id. The court was also influenced by the management rights clause in the Amoco CBA, which reserved to management's discretion anything not specifically regulated or forbidden by CBA language. In order to resolve the plaintiffs' claims, therefore, a state court would have had to "construe[ ] the collective bargaining agreement and reject[ ] Amoco's interpretation of the management-rights clause." Id. at 709. On that basis, we agreed that the claims were completely preempted by federal law.
 
 
 14
 A second case on which Ameritech relies is Douglas v. American Information Technologies Corp., 877 F.2d 565 (7th Cir.1989). There we also found that an employee's claim for intentional infliction of emotional distress was preempted by § 301. The plaintiff's complaints all dealt exclusively with workplace harassment, including the arbitrary denial of excused days off, "unwarranted and excessive" scrutiny of her work, and an "unjustified" final warning, all allegedly because she refused on doctor's orders to accept overtime work and certain "highly stressed work." Id. at 567-68. Because Douglas's allegations all directly concerned the terms and conditions of her employment, we held that resolution of her claim would be "substantially dependent on an analysis of the terms of the collective bargaining agreement under which she is employed" and that her state law claim was therefore preempted. Id. at 573.
 
 
 15
 We find both Amoco and Douglas distinguishable from the present case. Most importantly, both arose out of complaints relating to conditions at the workplace, which are quintessential subjects of collective bargaining. Thomas Schmidt, it bears repeating, is not making any claim about surveillance of his workplace telephone, his workplace environment, or even about Ameritech's use of surveillance techniques such as surreptitious photography of public behavior that would be available to any other employer to check on disability fraud. He is asking only that Ameritech treat access to his residential telephone records the way that General Motors, Pepsi Co, or IBM would have to treat access to residential telephone records. His claim essentially rests on a dual capacity allegation. Ameritech had to respect his capacity as a residential telephone customer and treat his MUD records the same way it would treat all other MUD records, even though he fortuitously also was an Ameritech employee. Whether or not this is true depends not on the scope of the collective bargaining agreement between Ameritech and its employees, but upon the scope of Illinois privacy law. This is particularly true, we note, because the Ameritech CBA did not have a management rights clause along the lines of the clause in Amoco.
 
 
 16
 We find this case more like Keehr v. Consolidated Freightways of Delaware, Inc., 825 F.2d 133 (7th Cir.1987), where the court found that an employee's claims of intentional infliction of emotional distress, invasion of privacy, and defamation were not preempted by § 301 because the claims were not "derived from rights or duties provided for under the contract" and therefore "resolution of [plaintiff's] claims in no way depend[ed] on an interpretation of the labor contract." Id. at 137. In Keehr, a supervisor had made an insulting statement to an employee about the employee's wife's sexual activities. The employee alleged that the remark invaded his privacy and was an intentional infliction of emotional distress, while the wife claimed defamation and invasion of privacy. Id. at 135. The required § 301 analysis, we held, "focuses on whether the state tort action 'confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.' " Id. at 137 (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213, 105 S.Ct. 1904, 1912, 85 L.Ed.2d 206 (1985)). Since the state tort claim did not purport to give meaning to the terms of the labor contract, the court found no preemption.
 
 
 17
 Like the claims in Keehr, Schmidt's claims do not purport to give meaning to the terms of the CBA. They are completely independent of the CBA. The legal question is whether Ameritech has a duty to treat all residential customers similarly for purposes of MUD records access, or if its employees stand in a different position. We note in this connection that Illinois has recognized a distinct privacy right in one's telephone records based on Article I, Section 6 of the Illinois Constitution, which provides broader privacy protection than does the U.S. Constitution. See People v. DeLaire, 240 Ill.App.3d 1012, 183 Ill.Dec. 33, 37-38, 610 N.E.2d 1277, 1281-82 (2nd Dist.1993). See also 47 U.S.C. § 605 (prohibiting the unauthorized publication or use of wire communications). The contract between Ameritech and the Schmidts as residential customers had nothing to do with the CBA, nor, even more clearly, did Richie's residential telephone contract and MUD records.
 
 
 18
 We therefore find that the district court lacked jurisdiction over this case, because it was not governed by § 301 and there was no other basis of federal jurisdiction. Because it lacked jurisdiction over any federal claim, the court also lacked supplemental jurisdiction over the state law claims, making its ruling and reasoning as to those claims void. The judgment below is REVERSED and the case is REMANDED with instructions to remand it to the state court for further proceedings.