THOMAS SCHMIDT *et al.*, Plaintiffs-Appellees, v. AMERITECH ILLINOIS *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—01—0463

Opinion filed March 29, 2002.

REID, J., concurring in part and dissenting in part.

Christina M. Tchen and Michele L. Walton, both of Skadden, Arps, Slate,

Meagher & Flom, and Gail Neimann and Craig Knot, both of Ameritech Illinois, all of Chicago, for appellant.

James T. Harrison and Clay M. Ullrick, both of Harrison Law Offices, of Woodstock, for appellees.

JUSTICE GREIMAN delivered the opinion of the court:

Thomas Schmidt, while on disability leave from Ameritech for an injury unconnected to his employment, lied to his employer at least three times about going on a fishing trip. The employer then sought to determine his whereabouts by an intense investigation which included the examination and use of his personal telephone records. After being discharged, Thomas, his wife and his wife's employer filed suit on August 23, 1995, alleging that the defendants' conduct in 1994 constituted a cause of action entitled "unreasonable intrusion upon seclusion" and a second cause of action entitled "private facts made public." The circuit court directed a verdict on the "private facts made public" cause of action against the plaintiffs, who have not appealed that ruling.

On December 2, 1999, the circuit court submitted the one remaining issue—intrusion upon seclusion—to a jury, which returned a verdict against Ameritech. This appeal followed. Because we find that the facts presented in this case do not satisfy the elements of the tort of unreasonable intrusion upon seclusion, we reverse.

Thomas was employed with defendant Ameritech as a customer service technician. His wife, coplaintiff Cynthia Schmidt (Cynthia), was not an Ameritech employee, nor was Jeri Lynn Richie (Richie), who became the third plaintiff in this case. Richie was the owner of Reflections Salon of Beauty, a hair salon where Cynthia worked, and all three were Ameritech customers.

On June 26, 1994, Thomas injured his knee in an accident unrelated to his employment and claimed to be unable to work. Ameritech's policy with respect to such disabilities provided Thomas' absence from work automatically converted to disability leave after seven consecutive sick days. Consequently, he was compensated under Ameritech's disability benefit policy until he returned to work on August 4, 1994.

Under his union's seniority system, he previously had put in for a Canadian fishing vacation during the week of July 15 through July 24, 1994, and his supervisor had approved the request. However, Ameritech's disability policy provided that taking a vacation while also collecting disability is prohibited without written authorization. Ameritech reminded Thomas of this restriction in a July 5, 1994, letter.

Undeterred, he and his wife left for their previously planned fishing vacation even though he remained collecting disability. What is more, he lied to Ameritech at least three times concerning his whereabouts: first, he lied to his supervisor, Herb Mazanke, before he left on vacation; second, he again lied to Mazanke on the day of his return home; and third, he lied to a group of Ameritech managers, including Mazanke, on the day of his return to work.

During Thomas' disability leave, Mazanke became suspicious of Thomas' conduct. Because Mazanke was aware of Thomas' plans to go fishing in Canada in July, he suspected that Thomas might leave town impermissibly. Accordingly, Mazanke began an investigation to determine whether Thomas was guilty of misconduct. On July 14, 1994, Mazanke sent two managers to Thomas' home. Those managers waited in the Schmidts' driveway for Thomas to return home and instructed him to call Mazanke. During the call, Mazanke requested the telephone number and location of Thomas' physical therapist and discussed the possible restrictions on his work when he returned. When the telephone number that Thomas had provided for his physical therapist did not work, Mazanke again called Thomas and reminded him that his planned vacation was inappropriate while he was on disability.

On July 21, 1994, Mazanke called Ameritech's benefits department to determine if it had received the needed documentation from Thomas. After being told that it had no return date for Thomas, Mazanke again called him at home, received no answer, and left a message for Thomas to return his call. Mazanke's supervisor authorized a visit to Thomas' home for the following day and told Mazanke to contact Ameritech's security department to track down Thomas.

On July 22, Thomas called home to check his messages and found a message from Mazanke. Thereafter, that morning, Thomas called Mazanke and left a message. Mazanke, however, did not receive Thomas' message until afternoon because he was conducting the home visit at Thomas' home. During that visit, Mazanke parked on the street and knocked on the front and side doors, waited a few minutes, but got no response. While at the door, he noticed that some mail and newspapers had gathered on the porch. After lunch, Mazanke returned to Thomas' home and again knocked on all of the doors and received no response. He then left another message advising Thomas that he was at his house and questioning him as to his whereabouts.

On July 25, 1994, the Schmidts returned home. Thomas telephoned Mazanke to inform Mazanke that Thomas had seen his doctor that day and had been released to return to work on August 4, 1994. Mazanke demanded to know where Thomas had been on July 22,

1994, at the time he returned Mazanke's call. Again, Thomas lied and told Mazanke that the telephone call had been placed from Thomas' home. At that point, Mazanke knew that Thomas was untruthful about his whereabouts because Mazanke and another Ameritech manager physically were at the Schmidts' house at the time that Thomas called Mazanke.

Mazanke advised Thomas' union representative, Tony Tellez, of the issues of concern. On August 4, 1994, Thomas returned to work and Mazanke immediately called him into a meeting to discuss his whereabouts on the dates of July 15 through July 24, 1994. Present at this meeting were Mazanke, Thomas, Tellez, and another member of Ameritech's management, Doug Kotlinski. Thomas again stated that he had been home on that date, so it was impossible for Mazanke to have visited his home that day. Thomas then was told that he was being suspended pending Ameritech's investigation into the circumstances of his disability leave.

On August 11, 1994, Mazanke and Bill Gerlich from the Ameritech Security Group reviewed the "message unit detail" (MUD) records for the number assigned to Thomas. At trial, Gerlich testified that MUD records would show if outgoing calls were made from the Schmidts' telephone on the dates in question. On that date, Mazanke and Gerlich also reviewed Ameritech's "directory line records" (DLR), which provide "telephone book" information such as name and address, and directory account trouble history (DATH) reports, which would show whether their telephone was out of service or otherwise malfunctioning. In addition, Mazanke and Gerlich reviewed Ameritech's DLR reports for several other telephone accounts whose numbers had been frequently called from the Schmidts' home phone location. This included accessing and using the phone records of Cynthia's employer, i.e., Richie and her hair salon. Ameritech asserted that it reviewed those records after Thomas' deceitful answers to determine whether any calls had been made to the Schmidt home. Lastly, Ameritech reviewed its billing records for the AT&T card registered to Thomas.

Based on the information that Mazanke and Gerlich gained through their review of the telephone records, on August 11, 1994, Gerlich contacted the resort in Canada where the Schmidts had apparently stayed. On August 15, 1994, he contacted the kennel where the Schmidts had boarded their dog. Because he had reason to believe the Schmidts were fishing in Canada, he contacted the Ontario Department of Natural Resources to obtain a copy of Thomas' fishing license. Gerlich also contacted the Chicago police department and asked them to use their computer system to check on the license plates of vehicles

parked in the Schmidts' driveway. A call was also placed to the Schmidts' local post office to determine the time that the Schmidts' mail was delivered to their home each day.

On August 24, 1994, Thomas again was ordered to appear at a meeting. There, he was told by Mazanke and Gerlich that Ameritech knew the resort where he and his wife had spent their vacation, that Ameritech knew where he and his wife had boarded their dog, and that Ameritech knew the locations of the convenience store pay phone in Eau Claire, Wisconsin, that he had used when placing his last phone call while *en route* home from Canada. He was told by Mazanke and Gerlich that they had obtained that information by their review of Ameritech's MUD records for the telephone number listed to him. Thomas was then fired.

Immediately thereafter, he filed a grievance with the company. The grievance went to arbitration, and Thomas was ordered to be reinstated. However, the arbitrator found that because Thomas had attempted to mislead Ameritech while he was away on his fishing trip, he was refused a year's back pay that he sought.

Plaintiffs then filed suit to redress Ameritech's alleged invasions of their privacy. Defendants removed the action to federal court, claiming that plaintiffs' claims were preempted by section 301 of the Labor Management Relations Act (29 U.S.C. § 185 (1994)). On appeal, the United States Court of Appeals for the Seventh Circuit concluded that because section 301 did not apply, there was no independent basis for federal jurisdiction. *Schmidt v. Ameritech Corp.*, 115 F.3d 501, 506 (7th Cir. 1997). Accordingly, it remanded the case to the circuit court. As previously stated, the trial court entertained only one count—that of unreasonable intrusion upon seclusion. The sole basis for plaintiffs' claim on this count was Ameritech's allegedly improper review of the Schmidts' and of Richie's hair salon's telephone accounts. After a trial, the jury returned a verdict (1) in favor of defendants Mazanke and Gerlich and against the plaintiffs, and (2) against defendant Ameritech and in favor of the plaintiffs. The jury found Ameritech liable to Thomas, Cynthia, and Richie for compensatory damages of $75,000, $75,000, and $10,000, respectively, and imposed $5 million in punitive damages. Ameritech's motion for judgment *n.o.v.*, for a new trial, and for remittitur was denied, and Ameritech now appeals. Plaintiffs did not, however, appeal the circuit court's grant of the directed verdict on their claim for private facts made public.

Ameritech first argues that the trial court improperly imposed judgment and penal sanctions for conduct that was (1) not actionable in this appellate district at the time it took place, (2) not actionable at any time during the trial, and (3) not actionable at the time that judg-

ment was entered. In fact, Ameritech claims, the tort for which it was held liable has been rejected by this district as an unrecognizable cause of action since 1979. See *Kelly v. Franco*, 72 Ill. App. 3d 642, 646 (1st Dist. 1979). The *Kelly* court noted that the law in Illinois was inconsistent on this issue and held that even if it were to recognize the cause of action, the plaintiff's allegations were insufficient to support a cause of action for unreasonable intrusion upon seclusion. *Kelly*, 72 Ill. App. 3d at 646-47.

Further, Ameritech asserts that it was not until January 13, 2000—after the trial and the entry of judgment—that this court began to recognize the tort of unreasonable intrusion upon seclusion. See *Johnson v. K mart Corp.*, 311 Ill. App. 3d 573, 578 (2000). Accordingly, it argues, because the court in *Johnson* was the first to recognize this cause of action in the First District, the trial court in the present case improperly retroactively applied the prescripts of that tort against Ameritech's prior conduct.

Ameritech bases its argument on the notion that because this tort has never been recognized explicitly by this district, and because circuit courts are bound by the decisions of the appellate court of the district in which they sit (see *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 92 (1997) (holding that it was not unreasonable for plaintiffs, when faced with conflicting appellate authority, to rely upon the authority from their home appellate district)), the circuit court in this case erred in holding Ameritech liable for conduct that was not actionable in the first district.

■ Plaintiffs respond that, in 1988, the supreme court announced that it is fundamental in Illinois that the decisions of an appellate court are binding on all circuit courts, regardless of locale. *People v. Harris*, 123 Ill. 2d 113, 127 (1988). In 1990, the court reiterated that there is but one appellate court in the State of Illinois and denounced the notion that appellate court decisions are binding only on the trial courts within that district. *People v. Layhew*, 139 Ill. 2d 476, 489 (1990). Moreover, in 1996, the supreme court again reminded litigants that there is only one appellate court and warned litigants that where the appellate court's pronouncements on an issue are unsettled or express conflicting views, a defendant cannot rely upon only one of those conflicting views and ignore the other views. *People v. Granados*, 172 Ill. 2d 358, 371 (1996).

■ The circuit court's decision to recognize this tort and apply it to Ameritech is a legal matter that is entitled to no deference on review. *White v. City of Aurora*, 323 Ill. App. 3d 733, 735 (2001) (matters of law are reviewable *de novo*). Moreover, the issue of retroactive application is a question of law and is also subject to *de novo* review.

Initially, we note that the Illinois Supreme Court has never explicitly recognized a cause of action for intrusion into seclusion. In *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411 (1989), the supreme court discussed this tort as articulated by the Restatement (Second) of Torts (1977) and Prosser & Keeton on Torts (W. Keeton, Prosser & Keeton on Torts § 117 (5th ed. 1984)), but stated that its discussion did not imply a recognition of the action by the court. *Lovgren*, 126 Ill. 2d at 416-17.

■ However, as *Johnson* noted with regard to the appellate court cases, some districts have recognized this cause of action:

"The Third District recognized the intrusion upon seclusion tort in *Melvin v. Burling*, 141 Ill. App. 3d 786 (1986). In *Melvin*, the court set out four elements that a plaintiff must plead and prove to state a cause of action for intrusion upon seclusion: (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering. *Melvin*, 141 Ill. App. 3d at 789. See also the Second District case of *Benitez v. KFC National Management Co.*, 305 Ill. App. 3d 1027 (1999), recognizing a cause of action for unreasonable intrusion upon the seclusion of another." *Johnson*, 311 Ill. App. 3d at 578.

See also *Bank of Indiana v. Tremunde*, 50 Ill. App. 3d 480 (1977) (Fifth District, impliedly recognizing the cause of action); *Davis v. Temple*, 284 Ill. App. 3d 983, 993 (1996) (Fifth District, expressly recognizing the cause of action); but *c.f. Bureau of Credit Control v. Scott*, 36 Ill. App. 3d 1006 (1976) (Fourth District, not recognizing the cause of action); *Kelly*, 72 Ill. App. 3d at 646-47 (First District, not recognizing the cause of action).[1]

The *Johnson* court also looked at the First District's encounters with the tort of unreasonable intrusion upon seclusion since *Kelly*. Specifically, it noted that in *Mucklow v. John Marshall Law School*, 176 Ill. App. 3d 886 (1988), *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976 (1990), and *Dwyer v. American Express Co.*, 273 Ill. App. 3d 742 (1995), this district found that the plaintiff's allegations did not satisfy the first element of *Melvin*, but failed to express a view as to the conflict regarding the recognition of the intrusion-upon-seclusion cause of action, *i.e.*, it never said that the cause of action did *not* exist. *Johnson*, 311 Ill. App. 3d at 578, citing *Mucklow*, 176 Ill. App. 3d at 894, *Miller*, 202 Ill. App. 3d at 981, and *Dwyer*, 273 Ill. App. 3d at 745-46.

---

[1]Currently, the supreme court is reviewing the decision in *Johnson v. K mart Corp.*, 188 Ill. 2d 565 (2000) (appeal allowed).

In assessing *Mucklow*, *Miller*, and *Dwyer*, the *Johnson* court placed great weight upon the fact that those decisions explicitly applied *Melvin*'s four elements despite a reluctance to forcefully declare the tort's existence. Because those decisions ultimately rested on the fact that the tort's elements were not properly satisfied under *Melvin*, such a reluctance is, at any rate, understandable. Unlike those cases, however, the court in *Johnson* found all the elements to exist. Accordingly, as it was the first court in the First District since the issuance of *Kelly* to find that a plaintiff adequately demonstrated the tort's four elements, the *Johnson* court was the first to "expressly recognize a cause of action for the tort of invasion of privacy by intrusion upon seclusion in this state." *Johnson*, 311 Ill. App. 3d at 578.

■ We agree with *Johnson* that this district's prior application of the four elements of the tort—without ever specifically asserting that a cause of action for intrusion upon seclusion exists—constitutes at least a peripheral prior judicial acceptance of the tort. In other words, we think that *Johnson* did not establish, or claim to establish, a new principle of law and was not a case of first impression. This necessarily means that it did not and could not overrule prior rulings of the First District (*i.e.*, *Kelly*, 72 Ill. App. 3d 642). Accordingly, as the *Johnson* court applied the prescripts of the tort that it found previously had been actionable in the First District, it is also impossible for *Johnson* to be applied retroactively in the case at bar. Indeed, the facts giving rise to the complaint in *Johnson* took place during 1992-93, even well before the facts giving rise to the instant suit. *Johnson*, 311 Ill. App. 3d at 575.

It appears uncertain whether the supreme court's decision in *Aleckson* superceded *Granados* and the similar line of reasoning in *Harris* and *Layhew*. Two supreme court justices apparently believe that was the case:

> "Because there is only one appellate court, a decision by any division of that court is binding precedent on all circuit courts throughout the state, regardless of locale. *People v. Harris*, 123 Ill. 2d 113, 128 (1988). That being so, I fail to see how the majority can hold 'that when conflicts arise amongst the districts, the circuit court is bound by the decisions of the appellate court of the district in which it sits.' 176 Ill. 2d at 92. Such a rule makes sense in the federal judiciary, where there are various courts of appeal which are autonomous, but it is wholly inconsistent with the principle that the appellate court in Illinois is a single body whose decisions are binding on every circuit court in the state.
>
> Given the unitary nature of the Illinois appellate court and the reach of its decisions, what circuit courts should be doing is follow-

ing the most recent appellate court decision on point. That is so even if the decision conflicts with a prior decision of an appellate court division located within the circuit court's particular district. The geography is simply irrelevant." *Aleckson*, 176 Ill. 2d at 94-95 (Harrison, J., specially concurring, joined by Heiple, C.J.).

Regardless of whether *Aleckson* overruled the line of reasoning employed in *Granados*, however, we agree with *Johnson* that the First District previously has recognized the cause of action for intrusion upon seclusion. Accordingly, our inquiry as to the viability of the tort ceases because we agree with *Johnson* that the cause of action was in place (albeit obliquely) at the time of Ameritech's conduct.

■ A finding that the cause of action has been recognized is, of course, not a finding that the tort's elements have been satisfied. Accordingly, Ameritech's next argument is that plaintiffs, as a matter of law, failed to prove at least two elements of the offense, thereby rendering the jury's verdict for unreasonable intrusion upon seclusion against the manifest weight of the evidence. Under the manifest weight of the evidence standard, we will not examine whether the evidence could have supported a verdict for the appellants but whether a contrary verdict is clearly evident. *Tedrowe v. Burlington Northern, Inc.*, 158 Ill. App. 3d 438, 444 (1987). In other words, the lower court's verdict will be reversed only if an opposite conclusion is clearly evident or when the findings of the jury are motivated by passion or prejudice or appear arbitrary or unsubstantiated by the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454 (1992).

■ As stated, the *Melvin* court found the following elements necessary to be pled and proven by the plaintiff to establish the tort of intrusion upon seclusion: (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering. *Melvin*, 141 Ill. App. 3d at 789, adopted by *Johnson*, 311 Ill. App. 3d at 578.

Initially, however, we think that *Melvin*'s recitation of the tort's elements, as adopted by *Johnson*, incorrectly states the requirement that the defendant's alleged intrusion merely be "offensive or objectionable to a reasonable person." This is in direct contrast to the requirement recognized by the Restatement of Torts and adopted by the supreme court in *Lovgren* that the standard of conduct to which this tort applies is *highly* offensive. See *Lovgren*, 126 Ill. 2d at 416-17, citing Restatement (Second) of Torts § 652B, at 378 (1977). Accordingly, we find that to succeed in adequately pleading and proving a cause of action for unreasonable intrusion upon seclusion, a plaintiff

must demonstrate that the intrusion is not only offensive, but *highly offensive* to a reasonable person.

Because the circuit court rejected Ameritech's proposed instruction regarding this matter, we find that Ameritech was greatly prejudiced. As Ameritech notes, "[e]ach party *** has the right to have the jury instructed on its theory of the case, and the circuit court, in the exercise of its discretion, must instruct the jury on all issues which it finds have been raised by the evidence presented." *Marin v. American Meat Packing Co.*, 204 Ill. App. 3d 302, 310 (1990). Where a party is prejudiced by the denial of an instruction, a new trial is warranted. *Alden Press, Inc. v. Block & Co.*, 173 Ill. App. 3d 251, 260 (1988). Consequently, if we did not find the plaintiffs' case to be otherwise unsound, we would reverse and remand for a new trial. At any rate, Ameritech also claims that the plaintiffs failed to show that its investigation of Thomas' conduct was unauthorized (element 1) and that anguish and suffering were caused *by the intrusion* (element 4).

Ameritech claims that three provisions of state and federal law authorize Ameritech's investigation. First, it was authorized by the employer/employee relationship that existed between Thomas and Ameritech. See *Fascian v. Bratz*, 96 Ill. App. 3d 367, 369 (1981) (employer "had a qualified right to make appropriate internal checks concerning the job conduct of its employees"); *Saldana v. Kelsey-Hayes Co.*, 178 Mich. App. 230, 234, 443 N.W.2d 382, 384 (1989) (holding that a privacy right is "not absolute in nature, but rather is limited by those rights which arise from social conditions, including the business relationships of the parties" (emphasis omitted)). Second, it was authorized by Illinois law, which has found that an organization's review of its own records is not an unreasonable intrusion upon seclusion. See *Dwyer*, 273 Ill. App. 3d 742; *Mucklow*, 176 Ill. App. 3d 886. Third, it was authorized by federal telecommunications law, which recognizes that telecommunications companies ought to be able to review their own records for business reasons and specifically exempts their review of the phone records they keep from certain privacy-related prohibitions. See 18 U.S.C. § 2511(2)(a)(i) (2000); 47 U.S.C. § 222(d)(2) (Supp. 1996). Of the three, Ameritech's concluding point is probably the most compelling.

■ In short, Ameritech asserts that two federal statutes have recognized the occasional need that telecommunications companies have to consult the telephone records they keep by allowing them to review those records when they have deemed it necessary to protect their "rights or property." The Electronic Communications Privacy Act, a criminal statute, expressly exempts from the statute's prohibi-

tions the company's "use [of] that communication *** while engaged in any activity which is a necessary incident *** to the protection of the rights or property of the provider of that service." 18 U.S.C. § 2511(2)(a)(i) (2000). Ameritech also claims that the Telecommunications Act of 1996 also recognizes and protects this same need. 47 U.S.C. § 222(d)(2) (Supp. 1996). However, as plaintiffs note, because the Telecommunications Act of 1996 was enacted two years after the conduct in question, it cannot provide the protection sought by Ameritech for its conduct in 1994. Accordingly, we agree with the circuit court that the Telecommunications Act is inapplicable.

The circuit court, however, refused to let federal statutory law play any role in this case. Ameritech argues that in the court's denial of its motion to dismiss (and in its motion *in limine* and proffered jury instruction), the court erroneously concluded that federal communications law is applicable only in connection with the provision of telephone service, even though the statute itself states that it relates to the provision of service *or* "rights or property." 18 U.S.C. § 2511(2)(a)(i) (2000). This, Ameritech claims, was reversible error, as those statutes expressly authorized its conduct.

Plaintiffs, of course, respond that the federal communications law to which Ameritech cites did not authorize its conduct. It notes that the trial court, in deciding Ameritech's motion to dismiss plaintiff's complaint, found that the information used by Ameritech in the present case was not used to protect Ameritech from fraud or deception in its provision of services. Instead, the court found that Ameritech used customer records to track an employee for purposes entirely unrelated to the provision of electronic communications services.

■ We are not persuaded by plaintiffs' arguments regarding the Electronic Communications Privacy Act. Apparently, the plaintiffs and the trial court agree that the protection of section 2511(2)(a)(i) of the Electronic Communications Privacy Act is applicable only if Ameritech consults its records in the course of providing electronic communications services or to protect Ameritech from fraud or deception in its provision of services. The statute, however, lists activities undertaken "incident to the rendition of [its] service" as only one way to access the statute's protection. 18 U.S.C. § 2511(2)(a)(i) (2000). Indeed, as Ameritech points out, the statute also allows Ameritech to use its records to protect its rights and property. The section, in its entirety, reads:

> "(2)(a)(i) It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to

intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service *or to the protection of the rights or property of the provider of that service,* except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks." (Emphasis added.) 18 U.S.C. § 2511(2)(a)(i) (2000).

It appears that the trial court was correct in its decision to disallow the evidence of this statute as proper authorization of Ameritech's actions where those activities were clearly not "incident to the rendition of [its] service." However, the trial court should not have ended its inquiry there. It also should have determined whether Ameritech's conduct was a necessary incident to the protection of its rights or property, where the term "rights or property" includes Ameritech's monetary resources. See *People v. Smith,* 31 Ill. App. 3d 423, 427-28 (1975), citing *United States v. DeLeeuw,* 368 F. Supp. 426 (E.D. Wis. 1974).

In *Smith,* the defendant allegedly illegally used a "blue box" to place long distance calls and bypass the telephone company's billing procedures. *Smith,* 31 Ill. App. 3d at 425. In order to nab the defendant, the telephone company's security manager recorded a number of dial tones that were abnormal and indicated illegal use. *Smith,* 31 Ill. App. 3d at 425. This court held:

> "The nonrandom, nonservice observing recordation of long-distance numbers dialed by defendant was therefore necessary to Illinois Bell's rendering of telephone service, and was necessary to protect the rights and property of the company. Such monitoring was therefore authorized by 18 U.S.C. § 2511(2)(a)(i)." *Smith,* 31 Ill. App. 3d at 428.

At trial, it was undisputed that Ameritech policy prohibits employees from taking a vacation while also collecting disability without written authorization. In fact, the disability plan itself provides that an employee on disability may not leave town without written authorization from three sources: the employee's physician, Ameritech's benefits committee, and the case manager. The purpose behind such a restriction seems clear: if an employee is collecting disability payments while he or she is, for all purposes, on vacation and is not having that vacation time deducted from his or her yearly allotment, then that person is actually receiving "double vacation time." It was undisputed that Thomas not only violated this policy, but lied about violating it as well.

The result of engaging in such a practice is that Ameritech unnec-

essarily would be depleting its monetary resources to fund an employee's vacation twice over, if and when that employee then decides to take an "official" vacation and has that vacation time deducted from his or her account. In other words, Ameritech essentially would be funding the equivalent of two employees' vacations while only receiving the benefit of one employee's work. Because Ameritech's investigation into an unnecessary depletion of its monetary resources necessarily involves a protection of its rights and property, especially in light of Thomas' admittedly deceitful actions, we find that Ameritech's conduct was authorized and protected specifically by this statute. Accordingly, because plaintiffs cannot demonstrate that Ameritech's conduct was unauthorized, *i.e.*, the first element of the tort, we find that the jury's verdict in favor of the plaintiffs was against the manifest weight of the evidence. The partial dissent's disinclination to extend the statutory authorization of Ameritech's dealings with Richie is, at least, understandable. However, where the plain language of the statute never sets a limit on whose records a telecommunications company may review in the course of protecting its rights and property, Richie's records—like the Schmidts'—are fair game. We simply cannot read a limitation into the statute.

As an aside, we also think it possible that Ameritech's conduct was reasonable in light of federal case law that requires an employer to conduct a documented investigation into an employee's alleged misdeeds before the employer may discipline that employee. See *Babb v. Minder*, 806 F.2d 749, 756 (7th Cir. 1986) (held that an employer was liable for defamation related to suspected employee misconduct and termination of employee without conducting an investigation). However, given our finding that Ameritech's conduct was, at least, authorized by federal law, we need not reach that conclusion. While our inquiry could end here, we choose to address the remaining issues because of their significance to this relatively untested cause of action.

The second element of the intrusion upon seclusion tort that Ameritech claims was not proven beyond a reasonable doubt is the requirement that the intrusion caused anguish and suffering. In fact, Ameritech claims, the plaintiffs have failed to prove the existence of any actual damage whatsoever. Rather, Ameritech argues that all of Thomas and Cynthia's evidence regarding damages was attributed to their feelings of sadness surrounding the loss of Thomas' job and not to the intrusion. And, because anyone seeking recovery under the unreasonable intrusion upon seclusion tort must prove that the *intrusion* caused anguish and suffering, Ameritech asserts that plaintiffs' claim must fail.

In support of this argument, Ameritech points to Thomas'

testimony that he was "scared" at the August 4, 1994, meeting and that he was "depressed" as a result of his suspension on that date. He also testified that he felt "terrible" when he informed his wife about the suspension. Ameritech claims that even Thomas' counsel phrased his questions in terms of Thomas' loss of his job, not Ameritech's review of his phone records:

"Q. Tom, after you were fired how did you feel?

A. Like everything was gone."

As with Thomas, Ameritech claims, there is no evidence of any injury to Cynthia arising from the intrusion, as all evidence related to her anguish came from the testimony of her husband and from Richie,[2] and it related to Thomas' job status, not the intrusion. For example, Thomas testified that, when he told Cynthia of his suspension on August 4, she "cried," left work, and was upset. He also testified that after his suspension, Cynthia was depressed, upset, and "crying all the time." Richie's testimony, Ameritech claims, was likewise related to Thomas' suspension and firing.

In addition, Ameritech asserts that none of the evidence that plaintiffs presented of mental anguish or suffering was sufficient to meet the standard for actual damages. Under Illinois law, a plaintiff must prove actual injury in the form of, for example, medical care, an inability to sleep or work, or a loss of reputation and integrity in the community in order to recover damages for torts such as intrusion upon seclusion. See *Gibson v. Philip Morris, Inc.*, 292 Ill. App. 3d 267, 279 (1997). Injury is not presumed. Restatement (Second) of Torts § 652H(b) (1977).

In the present case, therefore, Ameritech claims that not only was Thomas' claimed anguish unrelated to Ameritech's review of its phone records, but he admitted that he sought no medical or psychological assistance for any anguish or suffering. He also admitted that he never complained to Ameritech or any state or federal agency that Ameritech had invaded his privacy. Ameritech also asserts that the evidence of Cynthia's injuries was limited to her feeling upset and depressed because of her husband's suspension. As for Richie, she testified that, upon learning that Ameritech had accessed the phone records, she was "infuriated" and felt that a trust had been broken.

---

[2]Cynthia Schmidt was in a coma and had been for approximately two years at the time of trial. However, her condition is unconnected to the alleged cause of action. Testimony by a spouse, coworker, or other observer regarding their observations of a plaintiff's emotional distress or anguish has been recognized as providing an evidentiary basis to establish a plaintiff's suffering. *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 174 (1995).

Further, she claimed that the incident caused her to use her work phone less for personal calls and to advise her employees not to use the business phone for personal calls. However, Ameritech claims, there is no evidence that this hurt her business. Like Thomas, Richie also conceded that she never sought medical or psychological assistance and that she was not precluded from any work or social activity because of her alleged emotional suffering.

Plaintiffs respond that they need not prove that Ameritech's intrusion upon their seclusion was the only cause, nor the last or latest cause, of their anguish and suffering. Rather, they argue, it is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury. Based upon the proximate cause standard, which was set forth in the jury instructions, plaintiffs claim that the record reflects the jury's conclusion that Ameritech's intrusion upon their seclusion was the proximate cause of plaintiffs' injuries.

■ As plaintiffs conceded during oral arguments, the Schmidts experienced depression, fits of crying, and a disturbed marital relationship purely as a result of the loss of Thomas' job. While the Schmidts claim that the loss of Thomas' job was directly caused by Ameritech's intrusion upon their seclusion, we think the evidence conclusively shows otherwise. Thomas lost his job because he lied. Moreover, as plaintiffs concede, Ameritech already had more than enough evidence to build a sound case for discharging Thomas prior to the intrusion. Consequently, regardless of whether the pain and suffering experienced by the Schmidts was sufficient to meet the standard for actual damages, it was still attributable only to the loss of Thomas' job and would have occurred even if Ameritech never reviewed any of the Schmidts' records. Accordingly, we cannot say and the record does not reflect that the intrusion was the proximate cause of the Schmidts' claimed suffering. Without any further allegations of pain and suffering, therefore, we find the jury's determination that the Schmidts' pain and suffering was caused by the intrusion to be against the manifest weight of the evidence.

With regard to Richie, however, the evidence shows that she was infuriated and emotionally upset because Ameritech had broken the trust she placed in the company—not because Thomas lost his job. Furthermore, she noted at trial that, as a result of Ameritech's conduct, she changed her own phone use and the phone use of her business and her staff. Unlike the Schmidts, we find that Richie adequately demonstrated a causal relationship between her suffering and anguish and Ameritech's intrusion. With regard to whether she presented sufficient evidence of actual damages, the facts regarding

her change in her business phone use were properly before the jury. Accordingly, while we agree that the findings of the jury as to Richie's damages appear a bit thin, they are substantiated by the evidence. Regardless of whether we may have found otherwise, because we have no indication that such findings were motivated by passion or prejudice, we find that the jury's conclusion as to this element of Richie's cause of action was proper. Admittedly, however, such a finding is irrelevant in light of our holding that none of the plaintiffs were able to establish the tort's first element relating to unauthorized intrusion.

Having examined whether the elements of the tort were met, we then turn to the issue of damages. While we choose to address this issue because of its significance to the unreasonable intrusion upon seclusion tort, we wish to make clear that our determination on this matter also will not affect the ultimate outcome of our holdings above. In so doing, we find that even if we were to have found that the plaintiffs had pled and proved all the necessary elements of their cause of action, part of the compensatory damage award was against the manifest weight of the evidence and the entire punitive damage award was in error.

On appeal from the denial of a motion for new trial on compensatory damages, the standard of review is whether the verdict was against the manifest weight of the evidence. *Hollowell v. Wilder Corp. of Delaware*, 318 Ill. App. 3d 984, 990 (2001). As to the propriety of those damages, the supreme court has found that under the plain and ordinary meaning of the word:

> "Compensatory damages are '[d]amages sufficient in amount to indemnify the injured person for the loss suffered.' Black's Law Dictionary 394 (7th ed. 1999). Damages in turn are '[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury (the plaintiff seeks $8,000 in damages from the defendant).' Black's Law Dictionary 393 (7th ed. 1999). In light of these definitions, the plain meaning of the term 'compensatory damages' is a monetary award paid to a person as compensation for loss or injury." *In re Consolidated Objections to Tax Levies of School District No. 205*, 193 Ill. 2d 490, 497 (2000).

In this case, therefore, the compensatory damages should have been restricted to compensating plaintiffs only for the intrusion they suffered. As previously stated, Thomas testified at trial that he and his wife felt violated or depressed only because he had been fired. As noted above, Ameritech had plenty of evidence to discipline Thomas without relying on any of the plaintiffs' phone records. Consequently, because we find that the jury compensated both Cynthia and Thomas for the loss of his job and not for the review of the phone records, we

find that the damage award to the Schmidts was against the manifest weight of the evidence. However, because Richie was able to demonstrate that her actual damages directly resulted from Ameritech's prying into her phone records, we find that the jury's damage award to her was supported by the manifest weight of the evidence.

Regarding the imposition of punitive damages, the parties disagree as to our standard of review. Arguing that this issue is governed by a *de novo* standard, Ameritech notes the supreme court's holding in *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172 (1978), that "the preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law." *Kelsay*, 74 Ill. 2d at 186, citing *Knierim v. Izzo*, 22 Ill. 2d 73, 87 (1961).

In response, plaintiffs note this court's decision in *LID Associates v. Dolan*, 324 Ill. App. 3d 1047 (2001), which held that "[t]he decision to submit the issue of punitive damages to the jury is a matter reserved to the circuit court and its decision will not be reversed absent an abuse of discretion." *LID Associates*, 324 Ill. App. 3d at 1072. See also *Proctor v. Davis*, 291 Ill. App. 3d 265, 285-86 (1997); *Duignan v. Lincoln Towers Insurance Agency, Inc.*, 282 Ill. App. 3d 262, 271 (1996). Further confounding this issue is the fact that the supreme court has also stated that because the measurement of punitive damages is a jury question, that determination will not be reversed unless it is against the manifest weight of the evidence. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 81 (1994). Compare *Cirrincione v. Johnson*, 184 Ill. 2d 109, 116 (1998).

In resolving this issue, we adhere to the supreme court's language in *Cirrincione*:

> "While the question of whether punitive damages can be awarded for a particular cause of action is a matter of law (*Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)), the question of whether a defendant's conduct was sufficiently willful or wanton to justify the imposition of punitive damages is for the jury to decide (*Smith v. Hill*, 12 Ill. 2d 588, 595 (1958))." *Cirrincione*, 184 Ill. 2d at 116.

Here, Ameritech is contesting both whether punitive damages can be awarded for this action *and* whether its conduct was sufficiently willful or wanton to justify the imposition of punitive damages. Of course, where a court of review finds that punitive damages were improperly awarded for a particular cause of action in the first place, the inquiry need not proceed any further. We find that to be the case here.

In *Kelsay*, the supreme court noted that "[b]ecause of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded." *Kelsay*, 74 Ill. 2d at 188. There, the

court first recognized a cause of action for retaliatory discharge. However, it refused to uphold the circuit court's imposition of punitive damages because it would be "extremely unfair" to impose punishment for a cause of action that did not exist when the conduct took place. *Kelsay*, 74 Ill. 2d at 189. In so finding, the court stated that the penal nature of punitive damages renders them improper in cases involving novel causes of action:

> "[W]e are compelled to conclude that the award for $25,000 as punitive damages was improper. As we have noted, the function of punitive damages is similar to that of a criminal penalty, *i.e.*, as a punishment to the wrongdoer and as a means to deter such a wrongdoer and others from committing like offenses in the future. (See *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31.) Because of their penal nature, punitive damages are not favored in the law, and the courts must take caution to see that punitive damages are not improperly or unwisely awarded. (See *Eshelman v. Rawalt* (1921), 298 Ill. 192, 197.) Adherence to this rule compels us to conclude that punitive damages should not be awarded where, as here, the cause of action forming the basis for their award is a novel one." *Kelsay*, 74 Ill. 2d at 187-88.

In keeping with the principles of fundamental fairness espoused in *Kelsay*, we are compelled in this case to find that punitive damages were improperly awarded for this cause of action due to the confusion and disagreement surrounding the tort's existence in the First District. While we held above that the trial court properly recognized the cause of action for unreasonable intrusion upon seclusion due to the First District's prior recognition of the tort, we still acknowledged that the recognition in *Miller*, *Mucklow*, and *Dwyer* was only "peripheral" and "oblique." Moreover, when the supreme court addressed the tort's existence in *Lovgren*, it specifically refused to decide the issue. Accordingly, because the dispute surrounding the issue of the tort's existence was at least tenable on both sides, we find that it would be fundamentally unfair to *punish* Ameritech for conduct that it could not know definitively was actionable. This, of course, is not to say that Ameritech's conduct was not and could not have been actionable in tort, as we have held. Rather, we are simply holding that where Ameritech could not have known, with certainty, that its conduct was actionable, it would be unfair to assess damages that are in the nature of a criminal penalty.

On a final note, we also wish to comment on an evidentiary issue raised by Ameritech. At trial, the court allowed the plaintiffs to introduce, through Thomas, evidence from arbitrator John P. McGury's report to show that the arbitrator had ordered Thomas to be

reinstated. The court, however, prevented Ameritech from also using the report to show that Thomas had not been exonerated, but had been disciplined for lying and for his violation of the disability plan. Ameritech asserts that this ruling left the jury with the prejudicial and erroneous inference that Ameritech had punished Thomas wrongfully, because it was forced to rehire him. Once its hands were tied, Ameritech claims, the plaintiffs were then able to exploit the discrepancy when stating in their opening argument:

> "Well, on the 24th of August at the meeting Ameritech fired Mr. Schmidt. *** You will learn that subsequent to that meeting there was an arbitration of a greivance [sic] filed by Mr. Schmidt and you will learn that the result of the arbitration was that Mr. Schmidt was reinstated to his position but that the arbitrator did not provide Mr. Schmidt with back pay."

Ameritech argues that the plaintiffs returned to this theme in their closing arguments:

> "I want you to think about what Tom Schmidt lost. Ameritech thinks its [sic] okay to take away a year of Tom's pay. Fine. That's Tom's punishment for his intangible harm. Now it's time to determine Ameritech's punishment for its intangible harm. A year of Tom's pay and benefits is gone and emotional harm galore. Now its Ameritech's turn."

Without the arbitrator's report, Ameritech claims, it was unable to counter this argument and the jury was left with the unmistakable and unrebutted impression that (1) Ameritech improperly punished Thomas by taking away a year of his life, and that (2) the arbitrator had neglected his duty to make things right, thereby leaving Thomas in need of the jury's help. This was exacerbated, Ameritech concludes, by the fact that the arbitrator found that Thomas' misconduct was severe and substantial:

> "The Grievant [sic] [Thomas] throughout this episode was deceitful and uncooperative. The Grievant [sic] had been on disability in the past. He was not a stranger to the requirements of that status. He had numerous opportunities to put his cards on the table.
>
> Only at the last minute did the Grievant [sic] admit what had happened, after he and the Union had learned of the evidence that the employer had marshalled [sic].
>
> We conclude that the employer was justified in disciplining the Grievant [sic]."

■ "A trial court has the responsibility to determine the admissibility of evidence and this determination will not be overturned in the absence of a clear abuse of discretion. *Patch v. Glover*, 248 Ill. App. 3d 562, 567 (1993). Even if the trial court did abuse its discretion, a new trial should be ordered 'only when evidence improperly admitted

appears to have affected the outcome of the trial.' *Tzystuck v. Chicago Transit Authority*, 124 Ill. 2d 226, 243 (1988)." *Vickers v. Abbott Laboratories*, 308 Ill. App. 3d 393, 412 (1999). In other words, a new trial is necessary where the exclusion of evidence was the result of "serious and prejudicial errors made at trial." *Lagestee v. Days Inn Management Co.*, 303 Ill. App. 3d 935, 942 (1999). This is especially true where the exclusion of evidence deprives a party of the opportunity to prove its theory of the case. See *Wade v. City of Chicago Heights*, 295 Ill. App. 3d 873, 886 (1998).

■ In the present case, we find that, in light of the court's partial admittance of the arbitrator's ruling for plaintiffs' use, the exclusion of that report for Ameritech's use was an abuse of its discretion. "Generally when part of a conversation or statement is admitted in evidence, the entire conversation or statement relevant to the issue should be allowed." *Healy v. City of Chicago*, 109 Ill. App. 2d 6, 14 (1969). Here, it is clear that plaintiffs capitalized on the admittance of the arbitrator's decision in their attempt to make Thomas appear as the innocent victim, which he most certainly was not. In disallowing Ameritech the opportunity to rebut this evidence, the trial court inherently put Ameritech at the disadvantage of not being able to rebut plaintiffs' contention that Ameritech's conduct was especially unreasonable in light of Thomas' relatively "harmless" conduct. As it was, Thomas' conduct makes Ameritech's seem all the more reasonable. Again, if we did not find the plaintiffs' case to be otherwise unsound, we would reverse and remand for a new trial on this issue alone.

Because plaintiffs were not able to meet all of the required elements of the tort of unreasonable intrusion upon seclusion, *i.e.*, they were not able to show that Ameritech's conduct was unauthorized, and because the Schmidts were not able to show that the intrusion was the proximate cause of their claimed injuries, we reverse the decision of the trial court in its entirety.

Reversed.

QUINN, J., concurs.

JUSTICE REID, specially concurring in part and dissenting in part:

While I concur in part with the majority opinion, I feel compelled to write separately on a troubling aspect raised in this case. There can be no question that an employer such as Ameritech has a qualified right to protect its property interests against an employee who would commit fraud such as Schmidt did. 329 Ill. App. 3d at 1033. To that

end, the qualified right arguably would allow the employer to make appropriate internal checks concerning the job conduct of its employees. 329 Ill. App. 3d at 1033. My problem with this case is the idea that Ameritech's authority to investigate potentially dishonest employees extends without limit. It does not and should not. When it comes to a dishonest employee, one who is attempting to take advantage of his position for personal gain, such as abusing the vacation time system, that employee cannot reasonably object to said employer's attempts to catch him in the lies told. It is even reasonable to extend the investigation from the employee himself to his spouse, who by the nature of her relationship to the employee is likely to be caught up in the investigation. Since the spouse shares directory line records (DLR) and message unit detail (MUD) with her husband, she has no independent basis for objecting to the use of such information as detailed in the majority opinion. I believe that is where Ameritech's authority should have ended. However, in its zealous pursuit of the truth, Ameritech accessed the phone records of Jeri Lynn Richie, merely because she is Cynthia Schmidt's employer. I believe this is outrageous. While its interest in accessing the Schmidts' phone records is arguably legitimate, Ameritech does not have the same interest in accessing Richie's records. Independent of the relationship between Cynthia Schmidt and Jeri Lynn Richie, Ameritech would likely need an order of a court of competent jurisdiction in order to independently access Richie's telephone records. It shocks the conscience to think that the door to the invasion of privacy can be opened by any such a tenuous connection.

Additionally, the majority identified that Richie's claimed damages were substantiated by the evidence. 329 Ill. App. 3d at 1038. Since I would hold that Richie set out the elements of the tort of intrusion upon seclusion, and the majority found her damages to be substantiated, I believe the matter should be affirmed as to her.