RANDY GIBSON, Plaintiff-Appellee, v. PHILIP MORRIS, INC., *et al.*, Defendants-Appellants.

Fifth District   No. 5—96—0521

Opinion filed September 24, 1997.—Rehearing denied October 21, 1997.

Thomas C. Walsh, Michael P. Burke, Dan M. Lesicko, and Bryan Cave, all of St. Louis, Missouri, for appellants.

Bob L. Perica, of Hoefert & Perica, of Alton, for appellee.

JUSTICE HOPKINS delivered the opinion of the court:
Defendants, Philip Morris, Inc. (Philip Morris), Edward Giancola, Beverly Brock, and Charles J. Robinson (collectively defendants), appeal the trial court's judgment and award of both compensatory and punitive damages in favor of plaintiff, Randy Gibson, on his complaint for defamation. Defendants contend that, in this bench trial, plaintiff failed to prove the elements of defamation and that the trial court erred in awarding both compensatory and punitive damages. We affirm for the reasons set forth below.

## FACTS

Plaintiff testified that, on January 24, 1983, he was hired by Giancola, a division manager, as a sales representative for Philip Morris. Plaintiff was promoted to division manager in June 1989. As division manager, plaintiff often kept incentive items in his garage for distribution to his sales representatives. In July 1989, plaintiff was demoted for reasons unrelated to this appeal, and Giancola again became plaintiff's immediate supervisor when he resumed plaintiff's former position of division manager. On November 20, 1989, plaintiff was discharged by Giancola for "falsification and selling incentive items." The falsification allegation was based upon plaintiff's alleged failure to report a change in his work schedule on his daily activity report (DAR) on two separate occasions. The allegation of selling incentive items was based upon Brock's, Robinson's, and Jim Lumbattis's written statements to Giancola, wherein they alleged they saw Marlboro belt buckles (a Philip Morris incentive item) offered for sale at a yard sale at plaintiff's home in August 1988. Plaintiff filed a complaint against defendants, claiming wrongful discharge and defamation based upon Brock's and Robinson's written statements.

Plaintiff knew that Philip Morris prohibited the sale of incentive items, i.e., Marlboro belt buckles, lighters, T-shirts, etc., and that selling Philip Morris incentive items would result in discharge. Plaintiff denied that he sold Marlboro belt buckles at a yard sale in August

1988 and explained that he was in an all-day sales meeting that day in the company of Brock, Robinson, and Lumbattis.

Plaintiff worked for Country Companies, De Kalb Genetics, Cargill, and A-Mark after his discharge; however, he was unemployed at the time of trial, due to downsizing at A-Mark. Plaintiff admitted that, to his knowledge, no potential employer was told by Philip Morris that he was discharged or the reasons for his discharge.

Hope Gibson, plaintiff's wife, testified that she knew that selling incentive items, such as Marlboro belt buckles, was grounds for discharge from Philip Morris. Hope denied she sold or offered for sale Marlboro belt buckles at any yard sale she conducted. Helen Ryterski, plaintiff's neighbor who participated in the yard sale with Hope, corroborated Hope's testimony. Hope stated she held her yard sales when plaintiff was gone because plaintiff did not want anything to do with the yard sales.

Giancola testified that he fired plaintiff for selling incentive items and falsifying the DARs, which Giancola considered to be stealing company time and property. Giancola heard about plaintiff's offering Marlboro belt buckles for sale at a yard sale from Brock on October 24, 1989, during a work session. Brock told Giancola that two other sales representatives, Robinson and Lumbattis, witnessed the yard sale. Giancola also learned from Robinson that he knew about the offering for sale of incentive items at plaintiff's yard sale; however, Marlboro belt buckles were not mentioned. Giancola did not discuss the yard sale with Lumbattis until Lumbattis made his written statement.

On November 2, 1989, Giancola asked Brock, Robinson, and Lumbattis to make written statements about what they saw at plaintiff's yard sale and told them that the statements would be confidential. Giancola did not ask plaintiff for an explanation about the yard sale but only asked plaintiff if he had a yard sale, which plaintiff denied. Giancola admitted that none of the sales representatives advised him that plaintiff was in a sales meeting the day of the yard sale or that plaintiff did not participate in the yard sale. Giancola wrote a report on November 2, 1989, to Rosemary Milton, the director of human resources for the southwest region for Philip Morris, about his investigation of plaintiff's infractions, to which he attached Brock's, Robinson's, and Lumbattis's written statements.

In Giancola's report to Milton, he stated that plaintiff had incentive items at his house "priced" and "ready to be sold at a yard sale." Brock's attached written statement stated as follows:

"In the late summer of 1988 (August) while at Randy Gibson's home, I noticed a box of Marlboro belt buckles in an open box that

clearly said $1.50 each. The family was having a yard sale and apparently was selling these belt buckles at the above[-]mentioned price. Although I did not witness an actual sale, I can assume that they were sold or for sale."

Robinson's attached written statement stated:

"During the year of 1988—last summer, I[,] Jeff Robinson[,] actually visualized a Philip Morris incentive item being sold at a yard sale. The incentive item was the Marlboro belt buckle—still in the original shipping box which was cut open & clearly marked $1.50 each among other yard sale items on a table in the yard of Mr. & Mrs. Randy Gibson, 409 West Chester Street, Nashville, IL 62263."

Lumbattis's written statement stated that he saw incentive items "near the vicinity" of household goods offered for sale at the yard sale, but he saw no price tag on the incentive items.

A Philip Morris interoffice memorandum dated August 19, 1985, admitted into evidence established that Philip Morris incentive items were not to be used in any manner other than as a display or promotional item. The memorandum specifically noted that there were instances where incentive items were "being sold" at "flea markets" and that such conduct could result in an employee's discharge.

Brock, Robinson, and Lumbattis corroborated that they gave written statements to Giancola on November 2, 1989. All three testified that they were with plaintiff the entire day of the yard sale and that they saw the yard sale when they went to plaintiff's home after a sales meeting. None of the written statements given by Brock, Robinson, or Lumbattis established that an actual sale of the belt buckles transpired or that plaintiff participated in the yard sale.

Tony Johnson, section sales director for the St. Louis section for Philip Morris, testified that he was in the chain of command above plaintiff. Johnson became aware of problems with plaintiff in October 1989, when Giancola told him about a report Giancola received that plaintiff was "selling incentive items at a yard sale." Johnson told Giancola to talk to Milton and to investigate the report. Johnson recommended plaintiff's discharge.

Milton testified that she was employed in Philip Morris's Dallas, Texas, office in 1989. Milton first learned about plaintiff's alleged infractions through a phone call from Giancola on October 31, 1989. Giancola told her about the falsification of plaintiff's DAR of October 30, 1989, and that three sales representatives witnessed incentive items offered for sale at a yard sale at plaintiff's home. Milton advised Giancola to audit plaintiff's DARs further and to obtain written

statements from the sales representatives about the sale of incentive items. Milton received Giancola's written report of November 2, 1989, with the sales representatives' written statements attached, and forwarded the report to Manson Boze in the New York office. Milton recommended plaintiff's discharge, and the New York office agreed with the recommendation. Milton relayed the decision to discharge plaintiff to either Johnson or Giancola.

Milton testified that it is Philip Morris's policy regarding discharged employees to provide only dates of employment and the last position held to prospective employers. Milton denied that a potential employer is given information that a former employee was fired or the reasons for the discharge, and he testified that this policy applied to plaintiff.

The trial court ruled against plaintiff on his wrongful discharge cause of action but ruled for him on his defamation cause of action and awarded plaintiff $15,000 for lost wages, $100,000 for lost benefits at $20,000 per year for five years, $100,000 for personal humiliation, mental anguish, and suffering, and $1 million for punitive damages. It is from this order that defendants appeal.

## ANALYSIS

Defendants contend that plaintiff failed to prove his cause of action for defamation in four respects: (1) that Brock's and Robinson's statements were true, not false, or that the innocent construction rule applied, (2) that, if the statements were defamatory, there was no publication of the statements, (3) that the defamatory statements were qualifiedly privileged and were not made with actual malice, and (4) that plaintiff suffered no injury. Defendants also contend that the court erred in awarding compensatory and punitive damages for the defamation.

■■ To prove a claim of defamation, a plaintiff must show that the defendant made a false statement concerning plaintiff, that there was an unprivileged publication of the defamatory statement to a third party by defendant, and that plaintiff was damaged. *Krasinski v. United Parcel Service, Inc.*, 124 Ill. 2d 483 (1988). Statements can be either defamatory *per quod*, *i.e.*, requiring extrinsic facts to explain the defamatory character of the statements, or defamatory *per se*. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1 (1992). Four categories of statements are considered defamatory *per se*: (1) words that impute the commission of a criminal offense, (2) words that impute infection with a loathsome communicable disease, (3) words that impute an inability to perform or want of integrity in the discharge of duties of office or employment, or (4) words that prejudice a party,

or impute lack of ability, in his or her trade, profession, or business. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77 (1996); *Kolegas*, 154 Ill. 2d at 10. Even if a statement is defamatory, it may not be regarded as defamatory *per se* if the statement is *reasonably* capable of an innocent construction. *Bryson*, 174 Ill. 2d at 90. It is a question of law whether a statement is subject to an innocent construction. *Bryson*, 174 Ill. 2d at 90. A court is not required to strain to find an unnatural but possibly innocent meaning to determine that the innocent construction rule applies. *Bryson*, 174 Ill. 2d at 94. In addition to these principles, we are compelled to view all the evidence and the inferences to be drawn therefrom in the light most favorable to the winner, the plaintiff. *Quality Granite Construction Co. v. Hurst-Rosche Engineers, Inc.*, 261 Ill. App. 3d 21 (1994).

Defendants contend that the "gist" of Giancola's report was true or, alternatively, that the statements are subject to an innocent construction in that it was true that plaintiff "offered for sale" the incentive items even if he did not sell them, which is dischargeable conduct under Philip Morris's policies. Here, the evidence established that Brock's and Robinson's statements were false when they accused plaintiff of placing incentive items for sale at a yard sale. Their testimony revealed that plaintiff was with them the entire day of the yard sale, that plaintiff did not participate in the yard sale, and that none of the sales representatives saw an actual sale of Marlboro belt buckles. Brock's oral statement to Giancola was made while discussing plaintiff, thereby impliedly attributing the yard sale and the offering for sale of incentive items to plaintiff. Brock's written statement stated "the family" conducted the yard sale, again implying plaintiff's participation in the offering for sale of incentive items. Robinson's statement implied he saw an actual sale of incentive items at the yard sale. In contrast, plaintiff, his wife, and Ryterski testified that incentive items were not offered for sale at the yard sale. When this conflicting evidence is viewed in the light most favorable to plaintiff, the manifest weight of the evidence establishes that plaintiff did not offer for sale or sell incentive items at a yard sale, as he was impliedly accused of doing in Brock's and Robinson's statements. Further, the matter was compounded by Giancola's offering the statements as proof that plaintiff had violated the company's policy of using incentive items for prohibited purposes.

In addition, the trial court determined that Brock, Robinson, and Lumbattis were not credible witnesses, which is supported by the record. In a bench trial such as this, it is a court's province to determine the credibility of the witnesses and the weight to be given their

testimony. *Quality Granite Construction Co.*, 261 Ill. App. 3d at 24. Brock's, Robinson's, and Lumbattis's testimony conflicted in important details as to what they allegedly saw regarding the offering for sale of incentive items at the yard sale at plaintiff's home. Brock testified at trial that she did not have a "specific" conversation with Giancola about Marlboro belt buckles, but that the matter came up in "casual conversation." It is also noteworthy that extensive evidence was presented at trial on plaintiff's unrelated demotion, which was based upon Brock's complaint about plaintiff's handling of matters concerning her. The trial court may have found it strangely coincidental that Brock was linked to plaintiff's demotion and that she was also the catalytic force which commenced the process for plaintiff's discharge. These facts undermined the witnesses' credibility, especially Brock's. Thus, under the circumstances presented here, Brock's and Robinson's statements could have been found false by implication and could have been found to have been written in such a manner as to impute plaintiff with a want of integrity (theft of company property) in the discharge of his employment, the third category of defamation *per se.*

Further, Brock's and Robinson's statements are not subject to the innocent construction rule, application of which would remove the statements from the defamation *per se* category. We cannot see that there is any construction of the statements other than what is actually said, that incentive items were offered for sale at a yard sale at plaintiff's home, which, if true, violates Philip Morris's employment policy. The innocent construction rule does not apply within this context. Thus, the trial court properly found that Brock's and Robinson's statements were defamatory *per se.*

Next, defendants contend that plaintiff's cause of action fails because there was no publication of the statements, other than internally within the corporation. Defendants assert that interoffice reports within a corporation are only the corporation talking to itself and do not constitute publication. In support of their argument, defendants cite to numerous cases in other jurisdictions. None of these cases are binding on this court.

We find no clear statement of law in Illinois that interoffice communication within a corporation is not a publication. In two Illinois cases there are references to interoffice reports or internal communications of a corporation as not amounting to publication. In *Harrel v. Dillards Department Stores, Inc.*, 268 Ill. App. 3d 537, 543 (1994), this court reversed the trial court on other grounds but stated, in *dicta*, that a statement by a person in authority to another coemployee involved in an investigation of a plaintiff should not be

considered a publication, but this issue was left open for a future decision. In *Beauvoir v. Rush-Presbyterian-St. Luke's Medical Center*, 137 Ill. App. 3d 294 (1985), it was determined that a letter by a corporate official to his secretary "was conditionally privileged" because the plaintiff did not allege any facts to support an inference of malice and because the publication was made properly in the course of the corporate official's work for the corporation. *Beauvoir*, 137 Ill. App. 3d at 302. In *Beauvoir*, the discussion of publication arose in the context of a qualified privilege. We also note that the *Beauvoir* court qualified the letter to the secretary as being "made properly in the course of" the corporate official's work, an aspect we will discuss more fully later. In any event, there is no statement of law in Illinois that corporate internal communications are not publications.

■ The publication of defamatory statements is essential to a cause of action for defamation. *Beauvoir*, 137 Ill. App. 3d at 300. To show a publication, it must be established that the allegedly slanderous remarks were communicated to someone other than plaintiff. *Beauvoir*, 137 Ill. App. 3d at 300-01. However, not only must there be a publication of the defamatory statements, but according to *Krasinski*, the statements must be "unprivileged publication." *Krasinski*, 124 Ill. 2d at 490. The case law in Illinois invariably joins the publication of the defamatory statements with a discussion of whether the statements are privileged; therefore, we consider defendants' argument regarding publication in conjunction with the issue of privilege.

■ A qualified privilege exists where a communication that might be defamatory and actionable is not actionable because of the occasion on which or the circumstances under which it is made. *Harrel*, 268 Ill. App. 3d at 542. Conditionally privileged occasions have been divided into the following three categories:

> " '(1) situations in which some interest of the person who publishes the defamatory matter is involved
>
> (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved
>
> (3) situations in which a recognized interest of the public is concerned.' [Citation.]" *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 29 (1993).

However, even if a qualified privilege exists, the communication can still be defamatory and actionable if the privilege is abused. *Kuwik*, 156 Ill. 2d at 24-25. To prove an abuse of the qualified privilege, a plaintiff must show that there was a direct intention to injure him or that there was a reckless disregard of the plaintiff's rights and of the consequences that might result to him. *Kuwik*, 156 Ill. 2d at 30. Acts

constituting reckless disregard of a plaintiff's rights include the failure to properly investigate the truth, the failure to limit the scope of the material, or the failure to send the material to only the proper parties. *Kuwik*, 156 Ill. 2d at 30.

■ Given the definition of a publication—the communication to someone other than plaintiff—there was a publication in this case. Brock and Robinson made their statements to Giancola, a person other than plaintiff. However, we must determine whether the publication was unprivileged. Under the circumstances presented here, a qualified privilege exists for the internal communication of the defamatory statements. Philip Morris has a sufficient interest to know and to correct a situation where there is a suspicion of the sale of its property by employees. Brock's and Robinson's written statements to Giancola fall into the second class of qualified privilege, as the information is of interest to a third person, Philip Morris.

The trial court determined that Philip Morris had a qualified privilege but that defendants acted with actual malice, thereby abusing the privilege. While we agree with the trial court's determination that the privilege was abused based upon "actual malice," we also conclude that Philip Morris improperly investigated the truth of Brock's and Robinson's statements. Giancola admitted that he failed to allow plaintiff to explain, that Brock and Robinson failed to tell him that plaintiff was in an all-day sales meeting on the day of the yard sale, and that he passed the defamatory statements on to other corporate officials without discerning the truth of the statements. There is no evidence Giancola looked at corporate records, such as the DARs, to determine plaintiff's reported activities for the day of the yard sale. Further, none of the Philip Morris people in the chain of command above Giancola investigated the defamatory statements, but each corporate officer relied solely upon Giancola's report and Brock's and Robinson's attached statements. This was an improper and incomplete investigation of the truth of the matter. Philip Morris abused its qualified privilege, making Brock's and Robinson's statements actionable defamation.

We also note that, unlike *Beauvoir*, the defamatory statements by Brock and Robinson did not come about during the normal course of business. There is no evidence that when Giancola discussed plaintiff with Brock, Giancola suspected plaintiff of wrongdoing. The statements were not a result of an investigatory process but instead became the cornerstone upon which a case to discharge plaintiff was built. It is also noteworthy that the defamatory statements were not prompt reports and did not come to light until almost 14 months after plaintiff's alleged wrongdoing occurred, giving impetus to the

conclusion that they arose because of a malicious intent and not because of a suspicion of wrongdoing.

■ Next, defendants contend that plaintiff failed to prove any injury from the defamation. Defendants argue that plaintiff's loss of employment was not a compensable injury for the defamation because plaintiff would have been rightfully discharged for the falsification of his DARs alone. The supreme court stated in *Bryson* that if a statement falls into one of the actionable *per se* categories, a plaintiff, in order to recover, need not plead or prove actual damage to his reputation, and injury to a plaintiff's reputation is presumed. *Bryson*, 174 Ill. 2d at 87. We determined previously that plaintiff's cause of action fell into one of the categories of defamation *per se*. Thus, whether plaintiff could have been discharged for other reasons is irrelevant to whether he proved injury for his defamation cause of action. Injury to plaintiff's reputation is presumed, and the only facts that plaintiff had to prove in his defamation *per se* cause of action were that the statements made against him were false and that the statements were an unprivileged publication. The plaintiff made such proof.

· We next consider defendants' arguments regarding damages. Defendants assert that the award of compensatory damages was erroneous because (a) the statements were defamatory *per quod*, which does not allow for the type of damage alleged, *i.e.*, damage to health, mental anguish, and general economic loss, (b) the damages flowed from plaintiff's discharge, which was proper, and not from the defamation, and (c) the damages were based on speculation and did not bear a reasonable relation to any loss suffered by plaintiff. Having already determined earlier in this opinion that plaintiff proved that Brock's and Robinson's statements were defamatory *per se*, we need not discuss defendants' contention that the damages awarded were inappropriate for defamation *per quod*.

Defendants contend that because plaintiff's compensatory damages flowed from his discharge, which the trial court deemed proper, and not from the defamation, there was no causation between the defamation and the discharge, and the court erred in awarding compensatory damages based upon plaintiff's discharge. In support of their argument, defendants cite *Haudrich v. Howmedica, Inc.*, 169 Ill. 2d 525 (1996), and assert a "general rule of damages" for tort actions. The *Haudrich* case is not applicable as it involved the tort of products liability and not defamation. While *Haudrich* asserts a general statement regarding the assessment of damages, it does not support defendants' claim that because plaintiff could have been discharged for reasons other than defamation, he cannot be awarded

damages for any loss arising from the discharge. We disagree with defendants that no damages can be awarded for discharge if there is any reason, other than the defamation, that substantiates the discharge. This would defeat the purpose of allowing an action for defamation. Further, if there were legitimate reasons to discharge plaintiff, why defame his character to discharge him? The process that led to plaintiff's discharge commenced with the defamatory statements, giving credence to the inference that, if the statements had not been given, plaintiff would not have come under scrutiny for possible discharge.

■ The award of damages for defamation is an unsettled area of law. In Illinois, actual damages need not be pleaded or proved in a defamation *per se* action, as damage is presumed. *Bryson*, 174 Ill. 2d at 87; *Quality Granite Construction Co.*, 261 Ill. App. 3d at 26. The Restatement (Second) of Torts, sections 620 to 623 (1977), sets forth the types of damages recoverable in a defamation lawsuit. The Restatement (Second) of Torts states that damages for defamation *per se* include nominal damages, general damages for harm to the plaintiff's reputation, damages for special harm that a plaintiff alleges and proves he has sustained through the conduct of third persons, and damages for mental suffering and resulting bodily harm. Restatement (Second) of Torts, § 620, Scope Note, at 317 (1977); see also *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). The law on damages for defamation *per se* in Illinois corresponds to the Restatement (Second) of Torts. Presumed damages, in Illinois, are damages for economic loss ("special damages"), damages for mental suffering, personal humiliation, and impairment of personal and professional reputation and standing in the community. *Bryson*, 174 Ill. 2d at 87-88; *Winters v. Greeley*, 189 Ill. App. 3d 590, 597-98 (1989). Presumed damages are based upon the rationale that it is often extremely difficult, if not impossible, to present evidence to support an award of compensatory damages based upon the actual harm sustained. *Winters*, 189 Ill. App. 3d at 598.

■ Plaintiff's damages for lost wages and lost benefits are "special damages," *i.e.*, pecuniary losses, which are presumed and need not be proved. *Bryson*, 174 Ill. 2d at 87. In addition, the evidence supported the award. Plaintiff proved that his annual salary with Philip Morris at the time of his discharge was $39,500 and that he was unemployed for almost seven months. Plaintiff's records showed that he earned $28,596 in 1990. With regard to plaintiff's lost benefits, the exhibits admitted at trial revealed that plaintiff's benefits with Philip Morris were approximately $20,000 per year. Plaintiff testified that none of his subsequent positions equalled his benefits package at Philip Mor-

ris, most notably his pension and profit-sharing plan. The court calculated the lost benefits at $20,000 per year for five years. Defendants offered no evidence to contradict plaintiff's evidence. Thus, this evidence, if believed, supports the trial court's award of $115,000 for pecuniary loss.

The court also awarded plaintiff $100,000 for "personal humiliation, mental anguish and suffering." Again, damages for the elements of personal humiliation, mental anguish, and suffering are presumed damages, not easily quantifiable. *Winters*, 189 Ill. App. 3d 590. At trial, plaintiff testified that he was unable to sleep as a result of his discharge and that he was afraid he would not be able to provide for his family. Plaintiff's wife confirmed these problems and stated that plaintiff sought medical help. A friend of plaintiff's, Jack Stork, testified that plaintiff was devastated and was not the same person after his discharge. This evidence was uncontradicted and supported plaintiff's claim for emotional distress, and the court's award of $100,000 for this element of damages is affirmed.

■ Lastly, defendants claim that the award of $1 million in punitive damages from defendant Philip Morris violated their substantive and procedural due process rights and that the award was not supported by the evidence. In *Bryson*, our supreme court stated that the issue of the award of punitive damages in the absence of actual malice has not been considered yet as a matter of state law, and the court declined to address this issue as it was not raised or briefed by either party. *Bryson*, 174 Ill. 2d at 110. There is a clear inference that if "actual malice" exists, punitive damages would be appropriate.

In considering the state of the law on punitive damages prior to *Bryson*, we are cognizant that this court has held that punitive damages cannot be recovered where there is actual malice, an element of the tort, because this constitutes double recovery. *Costello v. Capital Cities Communications, Inc.*, 153 Ill. App. 3d 956 (1987). However, *Costello* was reversed on other grounds by the supreme court without addressing this court's holding on punitive damages. *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402 (1988). Cases after the supreme court's reversal of *Costello* have not followed the reasoning of this court regarding punitive damages in defamation cases but have held that punitive damages are recoverable where a plaintiff shows actual malice. *Krasinski v. United Parcel Service, Inc.*, 208 Ill. App. 3d 771 (1991); *Winters*, 189 Ill. App. 3d 590. Further, this court in *Quality Granite Construction Co.*, 261 Ill. App. 3d at 28, declined to follow our former decision in *Costello*. We again decline to follow our original holding in *Costello* and agree with the cases that followed. We hold that where the evidence establishes actual malice, punitive damages are recoverable.

Here, the trial court determined that $1 million in punitive damages was needed to adequately bring this matter to defendant Philip Morris's attention. The trial court observed the demeanor and attitude of plaintiff's coemployees and his supervisors within the Philip Morris corporate structure. The trial court observed defendants' efforts to exculpate the effects of defendants' conduct toward plaintiff. Defendants failed to investigate Brock's and Robinson's defamatory statements fully and acted with reckless disregard of plaintiff's reputation. The statements were not the result of an investigation but were gratuitous gossip maliciously conjured into a reason for discharge. This evidence supports a determination that defendant Philip Morris's actions constituted "actual malice," and we affirm the trial court's award of punitive damages.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Madison County is affirmed.

Affirmed.

KUEHN, P.J., and CHAPMAN, J., concur.