2022 IL App (1st) 210575

SECOND DIVISION
November 22, 2022

No. 1-21-0575

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| PROJECT44, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | 20-L-4183 |
| | ) | |
| FOURKITES, INC., | ) | Honorable |
| | ) | James E. Snyder, |
| Defendant-Appellee. | ) | Judge Presiding. |
| | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices Howse and Cobbs concurred in the judgment and opinion.[1]

**OPINION**

¶ 1      This appeal concerns defamation, the making of a false statement (written or oral) about the plaintiff that injures the plaintiff's reputation. Because defamation is premised on reputational harm, it is not enough that the plaintiff, personally, heard or read the false statement; that statement must be transmitted to at least one other person besides the plaintiff. In legal vernacular, the false statement must be "published" to a "third party," meaning literally anyone else besides the plaintiff. So, for example, if Individual A falsely tells Individual B, and only

_____

[1] Oral argument was held in this case via Zoom technology. Due to technical difficulties, Justice Cobbs was unable to fully participate in the oral argument but has listened to the full recording of the argument, as well having reviewed the briefs and otherwise participated in deliberations.

Individual B, that Individual B does business with terrorists, no defamation has occurred, because only Individual B heard the false statement—it was not "published" to a third party. A private conversation like that would not be actionable defamation. But if another person—even one more person—heard the defamation, the defamation would be deemed "published."

¶ 2       This publication rule is a cornerstone of defamation law. But it becomes more complicated when the one being defamed is not an individual but a corporation—and when the "third parties" to whom the defamatory statement was "published" are officers or employees of that same corporation. Are directors, executives, officers, or employees of a corporation "third parties" when the entity being defamed is the very corporation they serve? Or are these people to be considered so much a part of the corporation as to constitute the corporation itself? That is the question before us here.

¶ 3       The two corporations at the center of this appeal—project44, Inc. (which intentionally styles itself by the lowercase), and FourKites, Inc.—compete against each other in the hotly contested field of shipping logistics, where they both track and monitor packages sent throughout the world. In 2019, two members of project44's board of directors received an email from an anonymous Gmail account that accused project44, among other things, of engaging in accounting fraud and being associated with the Chicago mafia. Shortly thereafter, project44's recently hired chief financial officer received a similar message from a different e-mail address.

¶ 4       Project44 tried to discover who sent the e-mails. Its investigation tied the e-mail accounts to computers associated with FourKites. Believing that its competitor was trying to sabotage its business, project44 sued FourKites and several unknown "Does" for defamation.

¶ 5       In the circuit court, FourKites argued that the defamatory messages were never published to a "third party," as required by defamation law. FourKites claimed that project44's board

members and CFO were part and parcel of the corporation and inseparable from it—in other words, the people who received the messages *were* project44. And since you must publish a defamatory message to a third party for it to be harmful, there was no publication. The trial court agreed and dismissed the case on the basis that no publication occurred.

¶ 6       We do not agree. Our law has long recognized that a corporation can have its own reputation and identity, and if that reputation is attacked, it may use defamation actions to defend itself. And because a company's reputation can be separate and distinct from those who run it, even at an executive level, we reject the idea that the corporation is the same as the agents who oversee it. Since the allegedly defamatory messages targeted project44's reputation—not the reputation of the recipients—the defamatory messages were published to a third party. We thus reverse the judgment of dismissal and remand for further proceedings.

¶ 7                                      BACKGROUND

¶ 8       Because this case was dismissed for failure to state a claim, we accept all well-pleaded facts in the complaint as true and adopt all reasonable inferences in favor of the plaintiff. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 8-9 (1992); 735 ILCS 5/2-615 (West 2020).

¶ 9       Project44 and FourKites are shipping logistics companies who directly compete with one another for both customers and employees. Both are incorporated in Delaware but primarily operate out of Chicago.

¶ 10      Jim Baum and Kevin Dietsel are members of project44's board of directors but are not employees. On May 19, 2019, they received an e-mail from "Ken Adams," from a seemingly valid Gmail address. The e-mail's subject line read "Accounting improprieties at P44."

¶ 11      In the e-mail, Adams claimed to be a former project44 employee who recently left. He wrote that project44 used the threat of libel and defamation lawsuits to silence former

3

employees, and that the family of one of project44's employees "used to be the book keeper [*sic*] for the Chicago Mafia and they are using that to silence folks." The message also accused project44 of "rampant accounting improprieties" and encouraged Baum and Dietsel to look at the company's contracts for malfeasance. The e-mail also alleged that "there is widespread discontent brewing and it's just a matter of time before people go public and another Theranos happen [*sic*] in Chicago."

¶ 12     For context, the complaint alleges that the reference to "Theranos" compared project44 to Theranos, Inc., a company that fraudulently claimed to create a revolutionary blood-testing device that later was determined to be bunk. See, *e.g.*, *In re Arizona Theranos, Inc., Litigation*, 308 F. Supp. 3d 1026, 1036-39 (D. Ariz. 2018). The company is now embroiled in extensive and well-publicized litigation, and two of its key leaders, Elizabeth Holmes and Ramesh Balwani, have been convicted of various counts of fraud.

¶ 13     On May 27, 2019, a sender from another Gmail address going by the name "Jason Short" sent Tim Bertrand, project44's chief financial officer (CFO), an e-mail. Jason congratulated Bertrand on joining project44 but added that he wanted to give Bertrand some information so he could "fled [*sic*] ASAP and go find another job." Referring to a social media post Bertrand made, Jason said "you mention people, investors etc. in your [post]. There is one ingredient you missed—a great product. At some point you have to stop selling [expletive] and start delivering."

¶ 14     Jason also claimed project44 was a Ponzi scheme and compared it to Theranos. He invited Bertrand to talk to the company's former CFO, other ex-employees, customers, prospects, and outside investors but said that Bertrand would be making "a mistake" if he forwarded the message to project44's current CEO. "I sincerely wish you the best," Jason said in closing. "You seem like a nice guy, you deserve better."

¶ 15     Neither a "Ken Adams" or "Jason Short" ever worked at project44. On the assumption that both names were pseudonyms, project44 began investigating the source of the defamatory messages. Using petitions for discovery, project44 traced the Gmail accounts to computers associated with FourKites. Additionally, project44 was able to trace one of the accounts to an unknown internet protocol (IP) address operated by AT&T Mobility. Based on the investigation, project44 determined the messages came from someone associated with FourKites.

¶ 16     Coming up on the one-year limitations period, project44 filed a three-count suit against FourKites and various unknown "Does" who allegedly sent the messages. Counts I and II alleged that the May 19 and 26 e-mails were defamation *per se* against project44's reputation, while count III alleged that the parties engaged in a civil conspiracy to defame project44. Court filings indicate that project44 intended to continue trying to identify the anonymous "Does" and would presumably add them to the suit if their identities were discovered.

¶ 17     FourKites moved to dismiss the complaint, among other reasons, because the alleged defamatory statements were never "published" to a third party. In the eyes of FourKites, since Baum and Dietsel, the directors, and Bertrand, the CFO, were core members of project44's leadership, the defamatory messages were, in essence, communicated to the "person" being defamed. In other words, Baum, Dietsel, and Bertrand *were* project44, not third parties separate and distinct from the corporate entity.

¶ 18     The circuit court agreed and dismissed the case, finding that the messages were not published and, thus, the defamation claim failed as a matter of law. Since the defamation claims failed, the court also dismissed the claim for civil conspiracy to commit defamation.

¶ 19                                         ANALYSIS

¶ 20     We are presented with a question that might be seem easy, even obvious, if the defendant

were a natural person and not a corporate form, but which becomes more complicated when we introduce the corporate entity: When a false statement about a corporation is transmitted only to the people who make up the leadership of that company, has that false statement been "published" to a third party for purposes of defamation law? Are the directors, officers, agents, and employees of a corporation sufficiently separate and distinct from the corporation as to qualify as "third parties" in that context?

¶ 21    We begin with the basics. To establish defamation, the plaintiff must show that (1) the defendant made a false statement about the plaintiff, (2) the defendant published that false statement to a third party, and (3) the published statement damaged the plaintiff's reputation. *Goldberg v. Brooks*, 409 Ill. App. 3d 106, 110 (2011). There is no question that a corporation, just as a natural person, may maintain a defamation action under the same elements. See, *e.g.*, *American International Hospital v. Chicago Tribune Co.*, 136 Ill. App. 3d 1019, 1024-25 (1985); *Audition Division, Ltd. v. Better Business Bureau of Metropolitan Chicago, Inc.*, 120 Ill. App. 3d 254, 256 (1983); *Life Printing & Publishing Co. v. Field*, 327 Ill. App. 486, 488-49 (1946).

¶ 22    This appeal turns on the element of publication to a third person. "Publication" is a term of art in defamation law, but it is an essential element of any defamation claim. *Missner v. Clifford*, 393 Ill. App. 3d 751, 763 (2009). Usually, satisfying the publication element is straightforward; an allegedly defamatory statement is "published" when the defendant communicates that statement to anyone besides the plaintiff. See *Brooks*, 409 Ill. App. 3d at 110; *Emery v. Northeast Illinois Regional Commuter R.R. Corp.*, 377 Ill. App. 3d 1013, 1022 (2007); *Jones v. Britt Airways, Inc.*, 622 F. Supp. 389, 391 (N.D. Ill. 1985) (applying Illinois law).

¶ 23    FourKites, at this pleading stage, does not dispute that the allegedly defamatory e-mail messages were sent to Baum, Dietsel, and Bertrand. But the parties disagree over whether these

6

three individuals constitute "third parties" for purposes of defamation law.

¶ 24      Project44 claims that its directors, Baum and Dietsel, and its CFO, Bertrand, are "third parties" because the corporation has its own separate and distinct reputation. On the other hand, FourKites responds that a corporation can only act through its agents, managing principals, and governing board, which of course is true. See *Small v. Sussman*, 306 Ill. App. 3d 639, 647 (1999). So for all intents and purposes, says FourKites, the directors and CFO *are* the company. FourKites thus believes there was no "publication" here, as the messages were only transmitted to the company itself.

¶ 25      We are aware of no case law from Illinois that addresses this question, and we have been cited none. The parties consider this a question of first impression. For that matter, neither the parties nor our independent research have found more than a small handful of cases dealing with our precise question.

¶ 26      But we are not entirely adrift. We have considered a similar question in the context of defamatory communications made entirely within a corporation. More specifically, we have held that, when one employee defames another employee, and that defamation is transmitted to other coworkers within that same corporate structure, those other coworkers are considered "third parties" for defamation purposes. See, *e.g.*, *Popko v. Continental Casualty Co.*, 355 Ill. App. 3d 257, 260-61 (2005). The defamed employee has a reputational interest separate and apart from that of the corporation. See *id.*

¶ 27      The court in *Popko* referred to this doctrine as the "publication rule" or its converse, the "nonpublication rule" (*id.*), but since that could confuse things in the different context in which we find this appeal, we will refer to that doctrine from *Popko* more specifically as the "intracorporate publication" rule. Under that doctrine, interoffice reports or communications that

7

are circulated among employees within a corporation have been "published" to "third parties" for defamation purposes. *Id.*; see also *Gibson v. Philip Morris, Inc.*, 292 Ill. App. 3d 267, 272 (1997); *Jones*, 622 F. Supp. at 391 (interpreting Illinois law).

¶ 28     This "intracorporate publication" rule often comes into play when employees are terminated based on defamatory comments made by management or coworkers within the corporation. See, *e.g.*, *Popko*, 355 Ill. App. 3d at 259. The aggrieved employee then sues her former employer (and the employee who defamed her) for transmitting those defamatory statements. See *id.* at 259-60; *Gibson*, 292 Ill. App. 3d at 269-72; *Jones*, 622 F. Supp. at 390-91. In Illinois, the corporation that is named as the defendant in such an action cannot claim a lack of publication—it cannot defeat the lawsuit by claiming that the interoffice statements were merely "the corporation talking to itself." *Popko*, 355 Ill. App. 3d at 263; *Gibson*, 292 Ill. App. 3d at 274.

¶ 29     For what it's worth, Illinois is part of a growing majority of jurisdictions that has adopted the "intracorporate publication" rule. See 2 Rodney A. Smolla, Law of Defamation §§ 15:8, 15:9 (2d ed. 2022) (collecting cases; "This now appears to be the majority position and is gaining momentum."); Jane M. Draper, *Defamation: Publication by Intracorporate Communication of Employee's Evaluation*, 47 A.L.R.4th 647 (2022). The Restatement adopts this view as well. See Restatement (Second) of Torts § 577 cmt. i (1977) ("The communication within the scope of his employment by one agent to another agent of the same principal is a publication not only by the first agent but also by the principal and this is true whether the principal is an individual, a partnership or a corporation.").

¶ 30     So we know from our adoption of the "intracorporate publication" rule that an employee of a corporation can be a "third party" when hearing or reading defamatory statements made by

8

one employee about another employee within the company. And that is as it should be. In that context, Employee A has attacked the reputation of Employee B with defamatory matter transmitted to their coworkers. It would make no sense to lump Employee A, Employee B, and those coworkers into one corporate bundle and claim that what transpired was just "the corporation talking to itself." *Popko*, 355 Ill. App. 3d at 263; *Gibson*, 292 Ill. App. 3d at 274. Doing so would deny the reality that Employee B has her own personal reputation within the company deserving of protection, just as she has one outside the company. It is only proper to allow that employee redress.

¶ 31    Project44 submits that, just as the "intracorporate publication" rule respects the distinction between the reputations of an individual employee and that of the corporation, we should likewise recognize that distinction here. That is, in the context here, where it is the *corporation* being defamed, the individual employees or directors to whom the defamation is published likewise should be considered "third parties" to the defamation.

¶ 32    Though the analogy is not perfect, we agree with project44. And it comes down to this: A corporation is not only concerned with its reputation to the outside world. Just as employees care about their reputation within the corporation, the corporation cares about its reputation among its own employees—be they high-ranking executives, lower-level workers, or non-employee directors. Any corporation has an interest in attracting and keeping good employees. Indeed, many people today choose to work for a company based as much on the culture or values of that company as on the job functions they perform. Defamation that threatens the corporation's reputation within the company can be just as damaging as defamation published beyond the corporate walls. It would be odd, indeed, for the law to redress one of those reputational harms but not the other.

9

¶ 33    Perhaps the most fitting illustrations of this point would be those involving corporate sabotage. A competitor might communicate false statements about Corporation A to employees of Corporation A in the hopes of damaging the corporation's reputation among its workforce—whether to generally sow discontent, throw a wrench in its productivity, cause valuable employees to leave, or even steal away those employees.

¶ 34    We need look no further than the allegations of the complaint before us (which we say again are only allegations at this point). If we are to believe the allegations, agents of FourKites sent an e-mail to project44's recently hired CFO, falsely alleging accounting improprieties at project44 and explicitly urging him to leave before a major fraud scandal broke. If true, it requires no imagination to say that the point of this e-mail, if nothing else, was to drive that CFO out of a company he had just joined. The other e-mail was sent to two members of the board of directors, likewise (allegedly falsely) accusing project44 of accounting improprieties and urging them to conduct an internal investigation. It would be reasonable to infer that the sender of this e-mail, at a minimum, was trying to inject chaos into project44's workplace.

¶ 35    Simply put, the complaint alleges that FourKites was sending false, destructive messages to high-ranking officers and directors of project44, obviously intending to cause damage to project44 in various ways. It would be unrealistic, unfair, and contrary to any principle of defamation law we recognize to embrace the artifice that these directors and officers were merely part and parcel of the corporation, that no harm to project44's reputation occurred because nobody besides the corporation itself received these messages. We thus hold that, by alleging the transmission of defamatory messages about project 44 to directors and an officer of project44, the complaint adequately alleges publication.

¶ 36    Our view is in line with those of leading scholars on the subject, as well as the

10

Restatement provision on publication. See 3 Dan B. Dobbs, The Law of Torts § 520 (2d ed. 2011) ("the plaintiff is entitled to her reputation with her agents as well as with others"); Prosser and Keeton on the Law of Torts § 113, at 798 (W. Page Keeton *et al.* eds., 5th ed. 1984) (defamatory message may be published "to any third person. It may be made to a member of the plaintiff's family, including his wife, *or to the plaintiff's agent or employee*." (Emphasis added.)); Restatement (Second) of Torts § 577 cmt. e (1977) ("the communication to a servant or agent of the person defamed is a publication").

¶ 37    As project44 notes, our view is also in line with that of New York, which has addressed this very subject. As a federal court of appeals recently quoted New York law on this subject:

> " 'There are decisions in some States that a communication of defamatory matter to an agent of the person defamed in response to an inquiry does not constitute a publication to a third person ... [b]ut the better view seems to us to be that taken in another line of cases, holding that *the communication to the plaintiff's agent is a publication*, even though the plaintiff's action may ultimately be defeated for other reasons. The agent is, in fact, a different entity from the principal; the communication to the agent is, in fact, a publication to a third person.' " (Emphasis added.) *Sleepy's LLC v. Select Comfort Wholesale Corp.*, 909 F.3d 519, 528 (2d Cir. 2018) (quoting *Teichner v. Bellan*, 181 N.Y.S.2d 842, 845 (App. Div. 1959)).

¶ 38    FourKites raises several arguments why we should find that the CFO and directors were, in fact, part and parcel of the corporation, and thus no publication was alleged here. First, it cites decisions from Utah and Florida where the courts held that transmitting a defamatory message about a corporation to an officer of that corporation is not publication.

¶ 39    We are not persuaded by the Florida decision, *Hoch v. Loren*, 273 So. 3d 56, 57 (Fla.

Dist. Ct. App. 2019), principally because Florida is a jurisdiction that, unlike Illinois, does not recognize the "intracorporate publication" doctrine we discussed earlier. See, *e.g.*, *American Airlines, Inc. v. Geddes*, 960 So. 2d 830, 834 (Fla. Dist. Ct. App. 2007) (communications between executive or managerial employees of the same corporation are "the corporation talking to itself"). Florida courts do not believe that individual employees have reputational interests distinct from their corporation, but Illinois does.

¶ 40    The district court in *Fausett v. American Resources Management Corp.*, 542 F. Supp. 1234, 1241 (D. Utah 1982), noted that this question was one of first impression in Utah. The court reasoned that the individuals there who received the defamatory message, the top management of a company known as ARMCOR, could not be considered distinct from the company:

> "The law of defamation protects against the impugning of one's reputation or causing his alienation from his peers. There simply exists no potential for ARMCOR's reputation to be reduced or for ARMCOR to be alienated from its managers, customers, shareholders, institutional lenders, etc., when the defamatory statements are made to its management." *Id.*

¶ 41    For the reasons we have already stated, we do not accept that there is "no potential" for a corporation's reputation to be impugned to its employees at any level. And again, the allegations at issue here tell the story, if true, of a message sent to the newly hired CFO of project44 that made damaging allegations about project44 and explicitly advised the CFO to *leave the company* before a scandal broke. Taken as true at this stage, is that not the very definition of trying to drive a wedge between a corporation and its employee—to cause the CFO "to be alienated" from project44? *Id.*

¶ 42    Beyond that, the district court in *Fausett* addressed the passages in Professor Prosser's treatise and the Restatement, which we discussed above and cite again here. See Prosser and Keeton on the Law of Torts § 113, at 798 (W. Page Keeton *et al.* eds., 5th ed. 1984) (defamatory message may be published "to any third person. It may be made to a member of the plaintiff's family, including his wife, *or to the plaintiff's agent or employee*." (Emphasis added.)); Restatement (Second) of Torts § 577 cmt. e (1977) ("the communication to a servant or agent of the person defamed is a publication").

¶ 43    The district court noted that the *cases* that Prosser and the Restatement cited for support did not involve communications to upper management of the corporation. *Fausett*, 542 F. Supp. at 1241-42. But that is more a reflection of the dearth of case law on this subject than anything else. Both sources used the word "agent." We do not see why a CEO or president or director would be considered any less of an "agent" of a corporation than low-level employees. If either Prosser or the Restatement (or, for that matter, Professor Dobbs) had intended to carve out an exception within the corporate realm for "agents" who were higher up on the corporate ladder, one would think it would have warranted at least a brief mention. See 3 Dan B. Dobbs, The Law of Torts § 520 (2d ed. 2011) ("the plaintiff is entitled to her reputation with her agents as well as with others").

¶ 44    FourKites further argues that, if we hold that the transmission of an anticorporate message to the corporation's top executives qualifies as publication, we will be effectively "eviscerating" the publication requirement in the context of commercial defamation. And doing so, says FourKites, will lead to a floodgate of lawsuits in which corporations will bludgeon its critics into silence through defamation claims—even those critics who raise valid concerns in good faith about the practices of that corporation.

¶ 45    We certainly agree that the law should and does protect those who engage in valid discourse about corporate practices. We likewise agree that the leaders of that corporation are the people to whom those criticisms are best addressed. As FourKites aptly puts it, "If an individual cannot contact the chief executives or board members of a company to express their concerns about the company, who *can* they contact?" (Emphasis in original.)

¶ 46    Our disagreement is not on *whether* defamation law protects sincere, good-faith communications regarding corporate practices but on *how* the law does so. FourKites would have us use the "publication" element of a defamation claim to close the door to these defamation claims. But doing so would go too far—it would not only protect sincere, good-faith communicators from defamation liability; it would also protect those who transmit false messages in bad faith. If we hold, as FourKites urges, that a false statement about a corporation that is transmitted to an officer of that corporation can *never* be deemed published, then we will be insulating from liability not only those who act in good faith but those who act in bad faith, as well.

¶ 47    The tool the law uses is not the impenetrable wall of "publication" but the filter of "privilege." That is, a published defamatory statement is not necessarily actionable if the defendant can establish either an absolute or qualified privilege for publishing the communication. "A privileged communication is one that might be defamatory and actionable except for the occasion on which, or the circumstances under which, it is made." *Dent v. Constellation NewEnergy, Inc.*, 2022 IL 126795, ¶ 30. "The defense of privilege rests upon the idea 'that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation.' " *Edelman,*

*Combs & Latturner v. Hinshaw & Culbertson*, 338 Ill. App. 3d 156, 164 (2003) (quoting Prosser and Keeton on the Law of Torts § 114, at 815 (W. Page Keeton *et al.* eds., 5th ed. 1984)).

¶ 48    The circumstances under which a qualified privilege may be found, at least in Illinois, include

> " '(1) situations in which some interest of the person who publishes the defamatory matter is involved[;]
>
> (2) situations in which some interest of the person to whom the matter is published or of some other third person is involved[;] and
>
> (3) situations in which a recognized interest of the public is concerned.' "

(Internal quotation marks omitted.) *Dent*, 2022 IL 126795, ¶ 31 (quoting Fowler V. Harper, Fleming James & Oscar S. Gray, The Law of Torts § 5.25, at 216 (2d ed. 1986)); see also *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 28-29 (1993).

¶ 49    Courts in Illinois have not hesitated to apply a qualified privilege to insulate defendants from commercial defamation liability. See, *e.g.*, *Dent*, 2022 IL 126795, ¶ 35 (published defamatory statements by investigator of workplace sexual harassment allegations were privileged); *Kamberos v. Schuster*, 132 Ill. App. 2d 392 (1971) (defamatory statements about attorney made by her supervisors in memoranda and job evaluation reports were published but protected by qualified privilege); *Welch v. Chicago Tribune Co.*, 34 Ill. App. 3d 1046 (1975) (defamatory message about employee posted on newsroom bulletin board was published, but defense of qualified privilege might shield defendant from liability).

¶ 50    Indeed, we made this same observation in *Popko*, 355 Ill. App. 3d 265, when discussing the "intracorporate publication" doctrine, in response to a concern by the defendant that an expansive view of the "publication" element would inordinately expose a company to

defamation claims for communications that served a valid purpose. We found that such communications, when made for a valid reason in good faith, are protected by a qualified privilege. *Id.* We reasoned that using privilege to differentiate between valid and invalid claims of commercial defamation "properly balances competing interests," as opposed to "granting what would amount to an absolute privilege" for defendants if we applied an across-the-board rule that no statement transmitted to corporate executives could ever be deemed "published." *Id.*

¶ 51    Simply put, holding that anti-corporation statements made to an officer of that corporation could *never* be deemed "published" would throw out defamation lawsuits that otherwise had merit—even if the statements were false, even if they were made deliberately in bad faith, even if they damaged the reputation of the corporation in the eyes of those officers. It would go too far. But deeming those statements "published," when received by that corporate officer, would permit meritorious cases to go forward while still allowing for the defense of qualified privilege (or in the rare case, absolute privilege) to insulate those statements deserving of protection.

¶ 52    We are aware that some courts have blurred this distinction between publication and privilege. Indeed, in discussing the split in jurisdictions over the "intracorporate publication" doctrine, one commentator noted that "[t]he conflict of views is, apparently, attributable to a confusion between publication and privilege." Jane M. Draper, *Defamation: Publication by Intracorporate Communication of Employee's Evaluation*, 47 A.L.R.4th 647, § 2[a] (2022). Illinois law, however, firmly respects that distinction.

¶ 53    We have discussed the defense of qualified privilege only to fully explain our reasoning and to respond to concerns raised by FourKites. We express no opinion on the application of qualified privilege to this matter.

¶ 54　　We simply hold here that the two e-mails at issue—one sent to two directors of project44 and the other to project44's CFO, each of which included derogatory statements about project44—were "published" for the purposes of defamation law. The judgment of the circuit court is reversed.

¶ 55　　　　　　　　　　　　　　CONCLUSION

¶ 56　　The judgment of the circuit court is reversed. The cause is remanded for further proceedings.

¶ 57　　Reversed and remanded.

*Project44, Inc. v. FourKites, Inc.*, **2022 IL App (1st) 210575**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-L-4183; the Hon. James E. Snyder, Judge, presiding. |
| **Attorneys for Appellant:** | Douglas A. Albritton and Peter G. Hawkins, of Actuate Law, LLC, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Scott M. Gilbert and Adam Weiss, of Polsinelli PC, of Chicago, for appellee. |